AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____ Southern _____    District of    _____ New York _____

APRIL GALLOP, For herself and as Mother and
Next Friend of ELISHA GALLOP, a Minor,
Plaintiff,

V.

DONALD RUMSFELD, DICK CHENEY,
RICHARD MYERS and JOHN DOEs Nos 1-x

## SUMMONS IN A CIVIL ACTION

CASE NUMBER:  08 CV 10881

TO: (Name and address of Defendant)

DONALD RUMSFELD  DICK CHENEY  RICHARD MYERS

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Dennis Cunningham
Law Office
36 Plaza Street
Brooklyn, NY 11201

an answer to the complaint which is served on you with this summons, within _____ sixty _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

DEC 1 5 2008

J. MICHAEL McMAHON

CLERK                                                       DATE

(By) DEPUTY CLERK

✎ AO 440 (Rev. 03/08)  Civil Summons (Page 2)

**Proof of Service**

I declare under penalty of perjury that I served the summons and complaint in this case on _____,
by:

    (1) personally delivering a copy of each to the individual at this place, _____; or

    (2) leaving a copy of each at the individual's dwelling or usual place of abode with _____
        who resides there and is of suitable age and discretion; or

    (3) delivering a copy of each to an agent authorized by appointment or by law to receive it whose name is
        _____; or

    (4) returning the summons unexecuted to the court clerk on _____.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____.


Date: _____

                                      _____
                                                       Server's signature

                                      _____
                                                     Printed name and title


                                      _____
                                                       Server's address

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**08 CV 10881**

APRIL GALLOP, for Herself and as Mother
and Next Friend of ELISHA GALLOP, a Minor,

No. _____

              Plaintiff,

**Jury Trial Demanded**

vs.

DICK CHENEY, Vice President of the U.S.A.,
DONALD RUMSFELD, former U.S. Secretary
of Defense, General RICHARD MYERS, U.S.A.F.
(Ret.), and John Does Nos. 1– X, all in their
individual capacities,

              Defendants.



## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS, CONSPIRACY, AND OTHER WRONGS

**PRELIMINARY STATEMENT**

1. This case arises from the infamous Attack on America of Sept 11, 2001, and especially on the Pentagon; and is premised on an allegation of broad complicity in the attack on the part of key U.S. Government officials, beginning with and led from the top by Vice President Dick Cheney, then-Secretary of Defense Donald Rumsfeld, and Richard Myers, then acting Chairman of the Joint Chiefs of Staff. The plaintiffs allege that these and other government officials, whose identities will be ascertained from their proven or evident relevant roles and activities, and who are named herein as 'John Doe' defendants, together with other known and unknown operatives and functionaries, official and otherwise, engaged in an unlawful conspiracy, or a set of related, ongoing conspiracies, in which the concrete objective was to facilitate and enable the hijacking of the airliners, and their use as living bombs to attack buildings containing thousands of innocent victims; and then to cover up the truth about what they had done.

2.  The defendants' purpose in aiding and facilitating the attack, and the overall object of the conspirac(ies), was to bring about an unprecedented, horrifying and frightening catastrophe of terrorism inside the United States, which would give rise to a powerful reaction of fear and anger in the public, and in Washington. This would generate a political atmosphere of acceptance in which the new Administration could enact and implement radical changes in the policy and practice of constitutional government in our country. Much of their intention was spelled out prior to their coming into office, in publications of the so-called Project for the New American Century, of which defendants Cheney and Rumsfeld were major sponsors. There they set forth specific objectives regarding the projection of U.S. military power abroad, particularly in Iraq, the Persian Gulf, and other oil-producing areas. They observed, however, that the American people would not likely support the actions the sponsors believed were necessary, without being shocked into a new outlook by something cataclysmic: "a new Pearl Harbor". By helping the attack succeed, defendants and their cohorts created a basis for the seizure of extraordinary power, and a pretext for launching the so-called Global War on Terror, in the guise of which they were free to pursue plans for military conquest, "full spectrum dominance" and "American primacy" around the world; as they have done.

3.  In pursuit of the goals of the conspiracy, the named and unnamed defendants knowingly and by agreement committed a series of acts and omissions which were aimed at and did generally accomplish the following objectives:

+  To permit the men they later identified as the hijackers and any immediate accomplices to enter and remain in the country, and carry out the activities, movements and communications needed in their preparations for the hijacking, free from interference by police or counter-terrorist authorities; and then allow the groups of these men to book passage, all on the same day, and board the flights;

+  To cause normal operation of the regular off-course airline flight interception practice of the US Air Force, in cooperation with civil flight control authorities, to be altered, suspended or disrupted in such a way as to remove its protections, at least on that

day, and thus permit three of the four apparently hijacked planes to reach their targets and crash into them (or appear to do so...);[1]

+ To cause the normal operation of ground and air defenses which guard the Pentagon from external attack to be altered, suspended or disrupted in such a way as to remove or negate the building's normal protections, and thus permit an airliner, believed to be hijacked by possible suicide bombers, and following a forbidden, descending flight path, to reach the Pentagon undeterred;

+ To cause and arrange for high explosive charges to be detonated inside the Pentagon, and/or a missile of some sort to be fired at the building, at or about the time the wayward airliner supposedly arrived there, to give the false impression that hijackers had crashed the plane into the building, as had apparently happened in New York;

+ To arrange, thereafter, and fabricate, propound and defend, as part of the conspiracy, an elaborate, highly complex and sophisticated cover-up, centering around the Report of the 9/11 Commission, and continuing to this day.  To this end, defendants misappropriated the highest authority of government to block, misdirect and otherwise evade any fair, independent investigation of the evidence, and officially if implausibly explain away the evident wholesale failure of America's defenses with misinformation, omissions and distortions, withheld and destroyed evidence, and outright lies.

4.  In the attack on the Pentagon, in particular, plaintiff avers that the official story, that a hijacked plane crashed into the Pentagon and exploded (causing the plaintiff's injuries), is false. In fact, the bombing was accomplished another way, so as to limit the damage, protect the defendants, and only make it appear that a plane had been crashed into the building. This claim is supported by data from the plane's supposed "black box", released by the National Transportation Safety Board (NTSB), which indicate the plane passed over the building at very low altitude, just as an explosion and fireball were engineered by other means, a planted bomb or bombs and/or a missile.  This is supported by the lack of any photographic evidence of a wrecked airliner at the Pentagon, compounded by the record of reported refusal by the U.S. Department of Justice to release some 85 video tapes from surveillance cameras in locations at or near the Pentagon, which it has declared exempt from Freedom of Information Act disclosure.

---

[1]  Plaintiff alleges that no airliner actually hit the Pentagon.  See below

3

5.  Whatever way the bombing of the Pentagon was accomplished, however, and whatever else may or may not have been done by defendants to facilitate the hijackings that day, it is clear the defendant top commanders would have had and did have, at a profound minimum, enough foreknowledge, on that day and in the intelligence information they received beforehand, to have sounded a warning in time for plaintiff and others to evacuate the building, and thereby avoid much if not all the death and injury which occurred.  In the end, more than half an hour passed after flight controllers first sounded the alert on Flight 77, while all concerned were fully aware of the suicide crashes in New York; plenty of time for the Pentagon to be evacuated.  'Top gun' jet fighter-interceptors under defendants' command, available with time to spare, were not summoned; and the people in the building, including plaintiff and her infant, were not warned.  This was the result of unlawful conspiracy among these highest-level commanders, and others, who acted knowingly and intentionally to have the Pentagon attacked or to allow it to be attacked, without warning, with deliberate indifference to and in reckless and callous disregard for the fundamental constitutional and human rights of plaintiff and her child, and many other people, dead, injured and bereaved.

6.  Plaintiff April Gallop brings this action for herself and as next friend of her son Elisha Gallop now aged 7, who was a two-month-old baby in her arms on that day, her first back from maternity leave.  She was a career member of the US Army, a ranking specialist with top secret clearance, who had served six years, two-and-a-half of them in Germany, before being assigned to the Pentagon in 2000.  Her desk was roughly 40 feet from the point where the plane allegedly hit the outside wall.  As she sat down to work there was an explosion, then another; walls collapsed and the ceiling fell in.  Hit in the head, she was able to grab the baby and make her way towards the daylight showing through a blasted opening in the outside wall.  There was no airplane wreckage and no burning airplane fuel anywhere; only rubble and dust.

7.  Plaintiff and her baby both suffered substantial head and brain injuries, which seriously affect them still today.  Plaintiff charges that, because of the conspiracy alleged herein, she and her child and others were injured by acts of terrorism participated in by defendants.  Further, as more fully described within at Pars 57-59, she and her child were

and subsequently have been denied fundamental rights — including by acts of retaliation against her for raising painful questions about what occurred — as the cover-up continues.

**JURISDICTION & VENUE**

8. This Court has **jurisdiction** of this case, as follows:

a. Under the First, Fourth, Fifth and Ninth Amendments to the U.S. Constitution, as applied to federal officials under the rule of *Bivens v Six Unknown Named Agents*, 403 U.S. 388 (1971); and 28 USC 1331;

b. Under the federal Common Law — given that the most direct occurrences and mechanisms of plaintiffs' injuries, no doubt including crucial agreements and other communications among various defendants, took place in the Pentagon, a federal enclave — giving plaintiff a right of action in this Court for conspiracy to commit and facilitate actions likely to cause wrongful death, great bodily injury, terror and other loss to plaintiff and others to whom defendants owed a special duty of care; where, instead, defendants acted with reckless and callous disregard for and deliberate indifference to the likelihood of great harm to plaintiff and others, and deprivation of their rights;

c. Under the Terrorism Acts, 18 U.S.Code 2333(a), for acts of terrorism brought about by actions wholly outside the scope of defendants' duties, in perversion of their authority, and beyond the bounds or color of any law; and therefore not exempt or immune under the provisions of Sec. 2337, the application of which to exonerate these defendants would be unconstitutional.

9. **Venue** for the case is set by the special provisions of the Air Transportation Safety Act of September, 2001, 49 U.S.C. 40101, Subsection 408(b)(3), bringing all claims arising from events of 9/11 to this honorable Court .

**PARTIES**

10. Plaintiff APRIL GALLOP is an American citizen, resident of the State of Virginia, a member until this year of the U.S. Army, stationed at the Pentagon on 9/11, claiming for herself and for her minor child, ELISHA GALLOP, who was just two months old on 9/11/01, and was with her when the building was hit. Plaintiff respectfully

petitions the Court to appoint her as guardian *ad litem* for the purposes of this action and related matters.

11.   Defendants are DICK CHENEY, the Vice President of the United States; DONALD RUMSFELD, formerly and at relevant times Secretary of Defense of the U.S.; Gen. RICHARD MYERS, then acting chairman of the Joint Chiefs of Staff; all sued in their individual capacities.  Additional named, unknown defendants are other persons who were and are co-actors and co-conspirators in sundry phases of the (terrorist) undertaking complained of herein, whose identities, and some of whose precise places or functions in the plot(s) alleged herein are not yet known or fully known, but who certainly include high-ranking members of the Defense Department, the Military, the C.I.A., the F.B.I. and other agencies.  Such persons are named and alleged as co-defendants, designated as John Does Nos.1-X and hereby notified of this action, *pro tanto*, to be identified for the record and impleaded by plaintiffs as the particulars of both culpable and innocent acts and omissions by everyone involved in these events become known.

12.   **Existence of a Class**.  Plaintiff notes that a number of other persons suffered injury and loss in the Pentagon on September 11 as she did, and are similarly situated to her, plainly within the provisions of Rule 23, F.R.Civ P., so that she represents a Class, the members of which evidently are also entitled to recover judgment as sought herein. She does not now assert the Class interest; but, where it appears there could be action by the Court affecting this question, and a class could emerge, she wishes to and does hereby reserve the right, subject to the Court's approval, to act as lead plaintiff.

13.   **Limitations.**   There is no time bar to the claims in this action.  The Statute does not run against plaintiff's child, as a minor, under Virginia law (Va. Code Ann., §8.01-229**).**  As to the plaintiff herself, defendants and their cohorts and agents, by means of elaborate planned and other ad hoc cover stories, public lying, alteration of records, misappropriation of official authority and other nefarious activities, have concealed and continue to conceal, fraudulently, the truth about the attacks and the way they occurred — and their own participation and complicity in the range of acts and omissions needed, in furtherance of conspiracy, to bring them about.  Likewise, the original conspiracy to act secretly in furtherance of terrorism, and lie and dissemble afterwards, in order to

6

foment war and vengeance against the supposed perpetrators, has stayed alive and continued to harm the plaintiff, as she will show.

## STATEMENT OF FACTS

### I. Background: Al Qaeda and the 9/11 Attack

14.  As the world knows, four large commercial airliners filled with ordinary passengers were reported hijacked in the northeastern United States the morning of September 11, 2001.  Two were evidently crashed into the World Trade Center towers in New York, which later collapsed; a third was said to have hit the Pentagon in Washington DC, and the fourth, supposedly aiming for the White House or the Capitol, was reported crashed in Pennsylvania by its passengers, fighting back against the hijackers.

15.  The alleged hijackers were quickly identified by US authorities, supposedly from passenger lists, as 19 men of Middle Eastern descent, fifteen from Saudi Arabia, two from the United Arab Emirates, one Egyptian and one Lebanese.  Their pictures, apparent police mug shots, were shown on TV around the world soon after the attack.  It emerged that some if not all of these men were already known to police and intelligence authorities in the US and elsewhere as terrorist suspects.  They were said to be associated with Al-Qaeda, a network of radical 'Islamic' militants, led by the renegade Saudi aristocrat Osama bin Laden, and pledged to unremitting 'holy war' against the United States and its people.  Al Qaeda was blamed for several previous terrorist attacks, including suicide attacks in which hundreds died, in the Middle East and Africa, and against a U.S. Navy warship in the Persian Gulf.  An earlier, precursor group of 'Islamist' terrorists, based in Brooklyn and New Jersey, carried out the first bombing of the World Trade Center, in 1993.

16.  At the time the Clinton Administration was succeeded by that of George W. Bush and defendant Dick Cheney, in January, 2001, an extensive, complex U.S. counter-terrorism effort against Al Qaeda was in progress, involving personnel and resources from a number of government agencies, including the FBI, the CIA, the NSA, the U.S. Military, and others, requiring coordination between these agencies at the highest levels. The Chief of Counterterrorism under President Clinton, Richard Clarke, was retained by Bush, but later strongly criticized the Bush Administration for ignoring the Al Qaeda

threat, allowing the effort begun under Clinton to lapse, to the point where he felt constrained to apologize to the families of those who died, for the failure he said led directly to the devastation of September 11th. At all events, it is clear from the accounts of Clarke and others that, once Mr. Bush and Defendant Cheney were in office, the effort to combat Al Qaeda was decisively blunted at the top, and at key points down the chain of command.

17. In particular, little or no attention was paid by defendants and others responsible to an increasingly explicit series of warnings, during 2001, that Al Qaeda was hoping and planning to strike inside the US; and that there were concrete plans — which cadres in U.S. agencies were aware of, and were in fact conducting exercises to prepare for, and defeat — which included attempting to crash planes into important buildings. U.S. investigators were well aware that the man they believed was the enemy network's chief bomb-maker for the 1993 attack on the Trade Center, Ramzi Youssef, had hoped and attempted to bring a tower down in that attack; and that this remained a goal of the group.

18. Responsible intelligence officials were aware that Al Qaeda members were operating inside the U.S., and there were a number of critical investigative leads. Two of the hijackers-to-be lived with an FBI informant in San Diego. The CIA monitored a meeting in Malaysia in 1999, after which two of the participants came to the U.S., where authorities supposedly lost track of them. There were reports from FBI field offices in Arizona and elsewhere that figures on the suspect list were taking or seeking training as pilots — including one who reportedly said he only wanted to learn how to fly an airliner, not how to land or take off — but coordination and follow-up investigation on these and other leads was blocked by John Doe defendant CIA and FBI higher-ups and key players. Notwithstanding such malfeasance, the signs and portents of an imminent attack were very strong in the summer of 2001. As the then CIA chief George Tenet testified, "The system was blinking red."

19. Despite the flow of ominous information to various sections of the US counterterrorism apparatus, however, and the danger to innocent people — and as a result of conspiracy among defendants Cheney and Rumsfeld, and other members of the Government in various positions — the many warnings of a coming attack by Al Qaeda

forces (as many as forty messages in all, according to the Commission Report, from eleven different countries) were studiously ignored.

20.  That is, defendants and others in the highest circles of the Government knew more than enough beforehand about the threat and gathering danger of an imminent possible attack by Al Qaeda in the U.S. to understand that they needed to take strong, thoroughgoing measures to increase the country's protections and alertness.  Instead, led by defendants Cheney and Rumsfeld, and because defendants were callously indifferent to the rights and safety of innocents — including their own people in the Pentagon, plaintiff among them — the government did not respond.  On information and belief, no special meetings of high officials and agency heads were called, to make sure protections systems were on high alert and functioning properly, and that all needed information was being shared.  No special warnings were given to the Federal Aviation Administration, the Immigration Service, the Military and other affected agencies.  No consultations were had about possible methods of attack, including specifics about possible hijackings, and the use of planes as missiles to hit buildings, despite operational planning and training which had already occurred at lower echelons.  The FBI did not step up surveillance of suspected terrorist individuals or "cells", or immigration checks, or let such people know they were being watched, in order to impede their activities; and it appears that no coordinated, high-level monitoring and analysis of the threats, and planning for counteraction, ever took place.  Instead, the threat was dismissed, and ignored.

21.  It should be noted that plaintiff cannot and does not know with certainty the outlines of the plot at its initiation.  The attacks may have been conceived of as a false-flag operation from the beginning, with the defendants and their operatives as creators, planners, and executors, with the assistance of others as necessary.  Or, defendants may have employed Muslim extremists to carry out suicide attacks; or they may have used Muslim extremists as dupes or patsies.  The roles of the supposed "nineteen" could have been to hijack the airliners, or simply, unwittingly, to be on the planes when they were crashed into buildings by remote control.  It is also possible that the defendants learned of a plot originated by Muslim extremists, and co-opted or overrode it with their own plan. Whatever lay in the minds of the defendant conspirators at the outset, it is clear that the nineteen men so quickly identified as the hijackers, some if not all of them known

terrorist suspects, traveling under their own names, simply walked onto the four planes that morning, with their "box cutters", without hindrance or incident.

## II.  Failure of the Air Defense System.

22.  Accounts from the FAA and the National Military Command Center vary widely, suffer from internal contradictions, and are in conflict with each other; but credible reports show that FAA flight controllers were aware of a problem with the first plane as early as 8:14 or 8:15 a.m. the morning of September 11th, and evidently called the military for emergency assistance, pursuant to routine, by 8:21 a.m. or thereabouts. They learned the second plane was off course and not responding a short time later. According to reports, United Flight 11 hit the WTC North Tower at 8:46 a.m. and Flight 175 hit the South Tower at 9:03.  The Pentagon was hit at or about 9:32 a.m. — although the official version says 9:38 — and the fourth plane crashed in Pennsylvania shortly after 10:00 a.m.  High performance jet fighter planes stationed at various bases around the northeastern U.S. — tasked to intercept and deal with unidentified or straying aircraft entering or flying in U.S. airspace under NORAD district command, or otherwise at NORAD's disposal — were available at a moment's notice.  None were notified, however, or sent to the right place, until it was too late; at least for the first three planes.

23.  No interceptor planes came to stop the supposed hijackers — shoot them down if necessary — even though the Air Force has for many years maintained a practice of immediate response in which the fighters have readily been "scrambled" when aircraft are seen to go too far off course, or lose radio contact with flight controllers.  The interceptor program has been an elite assignment in the Air Force, even after the Cold War ended, in which pilots fly regularly, and wait in 'ready rooms' near the hangars, and planes are kept in top condition, with engines warm and ready for takeoff.  The best jets are used, which can reach speeds of 1600-1800 miles per hour, and the personnel are so well trained and practiced that pilots routinely go from hearing the scramble order to 29,000 feet in less than three minutes.  The scramble orders are normally made by local NORAD commanders in cooperation with the FAA.  Both the FAA and the affected NORAD North East Air Defense Sector (NEADS) military command have radar tracking coverage of the entire airspace, and special telephone hotlines between them and with higher authority.  Nor are these forays rare, reportedly occurring once or twice a week at

various U.S. locales during the past several years. Published Federal Aviation Administration (FAA) records showed that, between September 1, 2000 and June 1, 2001, interceptor jets took to the air 67 times to check on "in-flight emergencies" involving wayward planes.

24. No interceptors came to defend the Pentagon, in particular, and plaintiff and the other occupants, because of actions and failures to act by defendant Rumsfeld, Defendant General Myers and John Doe others in concert with them, even though more than an hour passed between the time the first warning went out to the Military, at or about 8:21a.m., and the attack on the Pentagon at 9:32; even though the first tower was hit in a suicide crash in New York at least 46 minutes before the Pentagon was hit; and even though 'combat air patrol' jets from any of several bases in the region could have reached the Pentagon — or the path of Flight 77 — in a fraction of that time.

25. Having pre-arranged a coordinated failure of the Pentagon defenses, and its warning system, the defendants hid and distracted themselves, and otherwise failed to act, just at the time they were needed to ensure defense of the building; and they have dissembled ever since, as part of the conspiracy, in representing where they were and what they did during that time. As with the planes that hit the towers in New York, the Military and the 9/11 Commission, while failing to cast blame, explained away the failure to launch fighter interceptors at the Pentagon as the result of a failure by flight controllers — which FAA personnel deny — to notify the Air Force of the flight emergencies in a timely way. This was cover-up, in furtherance of the conspiracy.

26. Likewise, by the acts of one or more defendants in furtherance of the conspiracy, no defenses at the Pentagon responded either, no missile or anti-aircraft batteries opening from the ground around the building, or the roof; no sharpshooters deployed with hand-held missiles at stations close by; nothing. And, shockingly, when the towers in New York had already been hit, and Flight 77 (or a substitute, see below) was out of radio contact and headed back towards the capital; and even when the plane approached, and then doubled back and headed toward the building in a long dive, no alarm was sounded.

27. It is evident, particularly with respect to the attack on the Pentagon in which the plaintiff and her baby were injured, that, if the building was hit by a plane that

morning, or if, as appears more likely, a plane flew low over the building at the time the bomb(s) went off inside and/or the missile hit, to give the (false) impression of a crash, some form of order or restriction was in force which suspended normal operation of the building's defenses.  In particular, it is indisputable that the expected response of the fighter-interceptors failed completely; and plaintiff avers this resulted from orders or authorization from within the defendant circle of Rumsfeld and Myers and their helpers, restraining normal operation of the protections system and armaments at the Pentagon — including but not limited to jets available at various bases near the capital.

28.  Plaintiff alleges further that such "standdown" orders, in whatever manner or form they had been prepared or issued, were maintained and affirmed by defendants up to and through that morning, and that defendant Cheney in particular, operating in the underground command bunker (Presidential Emergency Operations Center, or PEOC) beneath the White House, personally affirmed such an order. His word kept the order in force during the period between 9:20 a.m., when he was observed in the Bunker and the moment the Pentagon was hit.

29.  In this connection, plaintiff refers the Court to the testimony of then-U.S. Secretary of Transportation Norman Mineta to the 9/11 Commission.  Mineta testified that when he arrived at the White House, he was sent to the PEOC, and arrived at around 9:20 a.m., to find Cheney there, and in charge.  He said he sat at a table with Cheney for the next period of time, during which a young man came in the room, three times, and informed the Vice President that an "unidentified plane" was approaching Washington, D.C., first at 50, then 30, and then 10 "miles out"; and that, when he reported the distance as 10 miles, the young man asked the vice president, "Do the orders still stand?" Secretary Mineta testified that defendant Cheney responded sharply, "Of course the orders still stand.  Have you heard anything to the contrary?"  Whereupon the young man left the room; and a few minutes later, the hit on the Pentagon was announced.  This testimony by the Secretary has never been contested, discredited or explained away by any U.S. official.

30.  Plaintiff alleges that the "orders" were orders <u>not</u> to intercept or shoot down the approaching plane.  If the orders had been to attack the approaching plane, it would have been shot down before it reached the Pentagon — or at least some attempt to stop it

would have been made; and the world would know of it.    Based on some two hundred years of American military history, the failure would have led to a Board of Inquiry or other public official investigation, to determine how and why the defense apparatus had failed.  Individuals would have been called to account, and disciplinary procedures followed resulting in findings of responsibility and demotions or formal charges against those found to have failed the Country.  All of these bureaucratic events would have become part of the official record, and known to the public; none of which has happened. There has been no publicly recorded disciplinary action against any military or civilian officer of the United States government as a result of the attacks of September 11th. Such proceedings would have created a great risk that the truth would be exposed.

31.  The public record also shows that no meaningful follow-up questioning of Sec. Mineta occurred before the 9/11 Commission; that defendant Cheney has never testified under oath or been reasonably questioned about these events; and that he has given contradictory accounts, one of which---the account he gave to Tim Russert on "Meet the Press" five days after 9/11--- conflicts with The 9/11 Commission Report. The 9/11 Commission Report adopts an unsworn statement by Cheney that he never reached the bunker until about 10:00 a.m.; and contains no reference to Mineta's testimony, ignoring completely this contradiction between the two high government officials.  The Commission also ignores the fact that Richard Clarke's book "Against All Enemies" supports Mineta's testimony and hence contradicts the 9/11 Commission's account.

32.  Plaintiff charges that, in point of fact, the "orders" referred to were orders not to shoot the plane down, but to let it proceed, and that such orders were given and/or approved by defendants Cheney, Rumsfeld, and Myers, pursuant to the root conspiracy alleged herein, and transmitted down a chain of command. The normal expected operation of Pentagon defense that day was thus prevented, allowing the attack to succeed, or to "succeed" in creating a false and deceptive scenario of a plane crash.

### III.  The Attack on the Pentagon.

33.  At the Pentagon, the plaintiff was at her desk, with her baby, in her office on the first floor, when large explosions occurred, walls crumbled and the ceiling fell in. Although her desk is just some forty feet from the supposed impact point, and she went

out through the blown-open front of the building afterwards, she never saw any sign that an airliner crashed through. If Flight 77, or a substitute, did swoop low over the building, to create the false impression of a suicide attack, it was then flown away by its pilot, or remote control, and apparently crashed someplace else. At the building, inside or outside of the wall the plane supposedly hit, there was no wreckage, no airplane fragments, no engines, no seats, no luggage, no fuselage sections with rows of windows, and especially, no blazing quantities of burning jet fuel. The interior walls and ceilings and contents in that area were destroyed, but there was no sign of a crashed airplane. A number of those present inside the building and out have attested to this fact in published reports.

34. Instead, just when plaintiff turned on her computer — for an urgent document-clearing job she was directed by her supervisor to rush and begin, as soon as she arrived at work, without dropping her baby off at child care until she was finished — a huge explosion occurred, and at least one more that she heard and felt, and flames shot out of the computer. Walls crumbled, the ceiling fell in, and she was knocked unconscious. When she came to, terrified and in pain, she found the baby close by, picked him up, and, with other survivors caught in the area, made her way through rubble, smoke and dust towards daylight, which was showing through an open space that now gaped in the outside wall. When she reached the outside she collapsed on the grass; only to wake up in a hospital some time later.

35. Plaintiff's injuries could have been avoided, had an alarm been sounded. However, despite the undoubted knowledge of the defendant commanders and operators in the system that an unknown aircraft was headed towards Washington, possibly as part of the apparent terrorist suicide attack begun earlier in New York — and in spite of well-established Pentagon emergency evacuation procedures and training — there was no alarm. On the contrary, plaintiff was directed to go straight to her desk when she arrived at work, and when she got there, and turned her computer on, the place blew up. If an unauthorized non-military plane was headed towards the building, on a day when two apparently hijacked planes had hit the Twin Towers, why wasn't she evacuated, with her baby, instead of hurried inside? Why weren't alarms going off, and all the people in the building rushing to safety? Due to the conspiracy, and defendants' actions and flagrant failures to act, in furtherance of it, one hundred and twenty-five people, members of the

Military and civilian employees, died in the bombing; and many more including plaintiff and her child were seriously hurt.

36.   Plaintiff alleges further that, pursuant to the conspiracy, the attack on the Pentagon was contrived to "succeed" in only a very limited way.  Destruction, death and injuries, in comparison to what would have occurred if the building had been attacked straight on with a large plane, by enemies bent on causing the greatest possible devastation and loss of life, were kept to a minimum; and the conspirators themselves not put at risk.  Certainly the official account of what occurred is full of gross anomalies, which contradict the physical evidence, the scientific and aeronautical evidence, and the laws of physics and aerodynamics.  The 9/11 Commission Report is exposed as an artifact of the conspiracy, aimed at covering up the fact that no airliner crashed into the Pentagon, and that it was bombed a different way.

37.   The official account established in the 9/11 Commission hearings is that American Airlines Flight 77, a Boeing 757-200 jetliner, took off from Dulles International Airport at or about 8:20 a.m., and apparently was hijacked at about 8:55 a.m. some two or three hundred miles west of Washington.   Radio contact was lost, and the plane's "transponder" was turned off.  At that point, Flight 77 was traversing an apparent radar "dead zone", located over the southeast Ohio-West Virginia borderland, where another similar plane, fitted with radio control reception equipment, may have been substituted, so as to ensure that the precise maneuvers required by the conspirators' plan could be carried out.  Whichever plane it was soon established a flight path leading back towards Washington at high speed, on a downward trajectory, until it was close to the Pentagon.  There it began a two-and-a-half-to-three-minute spiral dive, from an altitude of about 8000 feet and in a 330-degree loop, which supposedly carried it into the northwest wall of the building.  Experts agree this dive was an aeronautically fantastic maneuver, nearly impossible for a plane of that size, which would require the most skillful and experienced pilot — or remote control.

38.  The returning plane, according to the official version, struck the Pentagon just above ground level.  There it disintegrated — even maybe vaporized, according to some accounts, at least in part — but, paradoxically, also plowed inside.  Had it simply flown straight into the top of the building rather than making its improbable spiral dive, there

would have been far greater damage and loss of life. Had it turned only 150-180 degrees, it could have smashed into the East side of the building, where the office of defendant Rumsfeld was publicly known to be located on the third floor, looking out at the river, with the Joint Chiefs and other high officials all nearby. In contrast, the ground floor area that was blown up held offices like the one plaintiff worked in, many of them empty for a remodeling project, which was said to have included reinforcement to protect against attack. Another part of the destroyed space held financial records.

39. Also in the official version, the nose of the plane supposedly penetrated the distance of the three outer "rings" of the building, leaving a large, nine- or ten-foot-high round hole — shown in official photographs, without any sign of a plane — in the inner wall of the third ("C") ring. The hole was located some *300 feet* from the alleged impact point, through a maze of structural pillars and interior walls. It was also said that the wings of the plane knocked over five lampposts along a nearby road, as it approached the building, which meant the wings were a maximum of 50 feet off the ground as the plane flew past, roughly 300-350 yards away from the near face of the building.

40. This account is at odds with known evidence, and raises substantial questions about the absence of evidence — and official withholding of evidence — including the following:

a. There are no photos of a wrecked airplane at the place where the building was hit and set on fire; or of airplane wreckage at the hole in the inner ring where the nose of the plane was originally said by Rumsfeld to have come to rest, or elsewhere inside the building. Moreover, the nose of such a plane contains radar equipment, and the outer shell is made of a porous, composite material that allows the radar to function. Therefore, the nose was not capable of surviving an impact with the outer wall without being crushed, let alone penetrating all the way inside to the C-Ring wall, 300 feet away. Although this story was later dropped, defendant Rumsfeld has never been publicly questioned about his statement that this is what occurred.

b. As noted, there is no footage from numerous video surveillance cameras — reportedly 85 different tapes are being withheld by the U.S. Justice Department — which are known or reliably assumed to have been operating at various nearby locations where some or all of the plane and the crash could be expected to have been caught on tape.

c.  The official account says the plane knocked over several lampposts with its wings — two on one side of a nearby road, three on the other — which meant the wings were less than fifty feet off the ground as the plane approached, over uneven terrain, and the undercarriage even closer.  The earliest photographs, taken before the upper floors fell in, about 30 minutes after the explosion(s), show the front blown off an expanse of the ground floor, no marks on the lawn in front of the impact zone; and several large cable reels standing in front of the building, unscathed.

d.  The "black box" flight data recorder identified by the Government as coming from Flight 77, and reportedly recovered from the wreckage at the scene, bears data, according to pilots who have examined printouts provided by the National Transportation Safety Board (NTSB), which contradict various aspects of the official account, — and indeed the very notion that a plane struck the Pentagon — in crucial ways, viz:

1.  It is a fundamental premise of airliner manufacture and operation that the black box only stops recording data when a flight is terminated — by the pilot turning off the engines at the gate, or by a crash.  According to the pilots who studied the printouts, however, the record showing the path of Flight 77, etched with codes which connect it to that plane that day, cuts off, unaccountably, some 4-500 yards short of the building — a point reached after the pitched, diving loop described above — at an altitude of 273 feet.  The Pentagon is roughly 75 feet high.  Just as they will confirm the improbability of that dive, expert pilots will attest that for a plane that size to descend from 273 feet, going approximately 500 miles an hour, and then level off inside of a quarter mile without hitting the ground — let alone get down to 50 feet in time to catch the lampposts, 300 yards closer — is an aerodynamic and gravitational impossibility.

2.  The Safety Board has released a computer simulation of the flight path of Flight 77, allegedly based on the data from the flight recorder, which contradicts a simulation adopted by the 9/11 Commission.  The Commission simulation shows the flight path of the official story, at an angle reflected by the damage inside the building, consistent with the downed light poles, and to the south of two nearby buildings housing the Navy Annex and a Citgo gas station.

The NTSB simulation shows the plane headed towards the building on a path north of the two buildings and the line of lampposts.

3.  Similarly, in the one fragment of a surveillance tape the Pentagon has released, two of the five frames disclosed appear to show an object, not recognizable as an airliner and apparently trailing a plume of white smoke, moving parallel to and just above the ground towards the Pentagon wall, followed by a bright explosion and a fireball mounting from the front of the building.  The NTSB's black box data shows Flight 77 was roughly 200 feet above the top of the Pentagon as it reached its last known position some 400 to 500 yards (2-3 seconds) away.  Thus, it could not have hit the building except by diving into it, and so could not have flown parallel to the ground between there and the point of impact.  So it appears that, contrary to the defendants' false cover story of an airliner suicide crash, there was a different, additional, flying object, which hit the Pentagon, and was part of the terrorist bombing that caused the plaintiffs' injuries.

e.  Additionally, the FBI identified the hijacker pilot of Flight 77 as "Hani Hanjour", supposedly a known terrorist suspect, who was reported to have received flight training in various places in the months before the attack.  His flight instructors, however, reported that Hanjour was such a poor flight student that he was barely able to fly a small Cessna; and then he was so erratic that instructors refused to go up with him, and, just a few months before 9/11, recommended he be washed out and his license taken away.  Thus it seems quite impossible that he could have flown the 757 really at all, let alone in its great uncanny dive.  There have also been repeated reports since 9/11 that several of the other men named and pictured by the FBI as the hijackers were still alive after 9/11, and living in various locations in the world — including one, Waleed Al-Shehri, who was said to be a working pilot for Moroccan Air Lines, correctly shown in the FBI photo, whose identity and location have been verified  by at least one major press outlet, the BBC.  This information has not been pursued by U.S. investigators, or media.

f.  Several trained and experienced military personnel at the scene noted the distinctive odor of cordite, a high explosive used in gunpowder, in the aftermath of the attack at the Pentagon.  This suggests explosives as the cause for the destruction rather than the impact and fire resulting from burning jet fuel.

g. One investigator has documented the fact that numerous clocks in the damaged area of the building stopped at 9:32 a.m., as the plaintiff's watch did also, supporting the idea that electrically timed or detonated explosives were used to bring about the intended damage to the building — and that the attack occurred at 9:32, not 9:38.

41. All the matters alleged in paragraph #40 are known and demonstrable, and most would have been immediately evident to the defendants at the time. As Secretary of Defense, defendant Rumsfeld in particular was in a unique position to determine the truth and fix responsibility. He did neither. That he did not is confirmation of his complicity in the attack--and his indifference to and callous disregard for the injuries and loss of rights suffered by plaintiff and others.

42. Further, it should be noted that on September 10, 2001, the day before the attack, Defendant Rumsfeld conducted a press conference at the Pentagon in which he publicly announced that auditors had determined that some 2.3 *trillion* dollars in Defense Department funds —$2.300,000,000,000 — could not be accounted for. To plaintiff's knowledge and belief, part of the area of the ground floor of the Pentagon that was destroyed in the bombing is a location where records were kept that would be used to trace those funds, and where people worked who knew about them. On information and belief, there has been to this day no public report concerning the fate of those records, or that money.

43. In any event, the plainly visible pattern of damage on the outside and in other photographic views makes it clear the building was not hit by a plane. There may have been a missile strike, perhaps penetrating through to the back wall, which helped collapse the section that fell in, possibly augmented by explosives placed inside. Photos taken before the collapse suggest this, showing a single blown-out window section, above the ground floor; and witnesses have reported seeing a helicopter above the building, and disappearing behind it, followed by a big explosion and bright fireball. As noted, a large roundish hole was found in the C-ring wall, some 300 feet inside the building; and there were credible accounts, ignored in the Commission Report, of serious bomb damage in the B-ring, second from the center, and even some reports of dead bodies in the central A-ring, also ignored. As shown on CNN television, a large military aircraft, identified as an E-4B — the so-called "Doomsday Plane", which carries the most complete and

19

sophisticated military command and control apparatus — was circling above Washington at the time the Pentagon was hit. It was in perfect position to coordinate the detonation and/or missile shot with a fly-over; and guide the airliner in its dive by remote control. It was also in perfect position to spot the oncoming plane on its radar and sound an alarm. Significantly, the Department of Defense has denied any knowledge of this airplane flying in that area on that day.

44. Whatever the cause of the bombing, and the traumatic injuries to plaintiff and others which resulted, the Government, of which the two main defendants were and have been the highest, most powerful officers, pursuant to the conspiracy they led and still lead as alleged herein, has been altogether deceptive in investigating, reporting and explaining the attack and its cause; and defendants, rather than righteously investigate and determine the derelictions which occurred, have done nothing but lie and cover up.

45. Defendant Rumsfeld in particular has been deceptive from the start, as where, on September 13, he reported on *Good Morning, America* that the plane "...went in through three rings (of the Pentagon). I'm told the nose is — is still in there, very close to the inner courtyard, about one ring away"; a palpably false statement, contradicted by numerous witnesses, a total lack of photographic evidence, and evident impossibility. Rumsfeld has also contradicted himself several times in describing his whereabouts and movements during the first hour or more of the attack. He does not acknowledge his presence in a teleconference which Richard Clarke said he, Rumsfeld, and others were part of, beginning shortly after 9:00 a.m. — after the Flight 77 emergency was reported, at or about the time the second tower was hit in New York, and more than half an hour before the Pentagon was hit — and he contradicts himself about whether and when he went to the Executive Support Center and/or the National Military Command Center, both within the Pentagon, as events transpired that morning. General Myers also (falsely) denied he was at the Pentagon in the early stages of the teleconference, as reported by Clarke. Tellingly, the tape of the videoconference, which obviously would have been part of any good faith investigation, has been kept secret.

46. Defendant Rumsfeld also made a striking prediction of the attack, as if speaking compulsively about his secret knowledge, that very morning, and several days later, he publicly referred to the "missile" that hit the Pentagon. In testifying before the

9/11 Commission, the defendant stonewalled and double-talked egregiously, responding to direct questions (some of them personally submitted by plaintiff herself during a hearing open only to survivors), especially about the Air Force fighter-interceptors not showing up, with irrelevant and sometimes incomprehensible ramblings. Consistent with their part in the cover-up, Commissioners failed to question him closely or confront his non-responsiveness.

### IV. The Other Planes.

47. In spite of what the record shows was a regular, timely alert and request to NEADS commanders by FAA flight controllers at Boston for in-flight emergency response regarding United Airlines Flights 11 and 175 out of Boston, as described above in Pars. 22-24, the jets were not scrambled, or properly "vectored", in time to intercept the planes that hit the Towers in New York — even though there was plenty of time for the interception.

48. With respect to Flight 93, which was thought to be intended for an attack on the White House or the Capitol, but crashed in Pennsylvania, there remains a great deal of mystery. Much of what supposedly happened was a made-in-Hollywood saga, where the passengers, learning of the earlier suicide crashes, gathered themselves and counter-attacked the hijackers, succeeding in heroic, self-sacrificing measure by crashing the plane (or causing the hijacker pilot to crash it) in a remote field, before it could approach its target. This story was supposedly recounted to persons on the ground by passengers with cell phones; but the science is clear that, at least in 2001, cell phones couldn't operate at the high altitude where the struggle supposedly took place. Also, the FBI, in presenting evidence at the Moussaoui trial in 2006, denied that any of the high-altitude calls that had been reported actually took place. The only cell phone calls confirmed by the FBI were two that reportedly occurred when the plane had descended to 5,000 feet. Thus, the mythic account is suspicious, to say the least.

49. Moreover, it appears fairly well established that one or more fighters ultimately did go aloft, and reached Flight 93, although this was also comprehensively denied in the Commission Report. There is also good evidence that supposed presidential authority to "engage", meaning shoot down the plane, was given by defendant Cheney at

or about 9:50 a.m. that morning, wherewith Flight 93 was indeed shot down with an air-to-air missile from a U.S.A.F. fighter jet.

50. Finally, there are multiple reports that debris from the plane was found a mile or more from the crash site, an obvious impossibility if the plane simply fell or dove into the ground. Likewise, there is no debris visible in photographs of the crash site, despite a long photographic history of airliner crashes showing plane parts and debris spread around the point of impact. Instead there was a crater, and no sign of the plane. Implausibly, however, the official report said that a visa, in the name of the alleged hijacker identified as the pilot, was recovered near the crater, along with a red headband of the type the hijackers supposedly wore. Again, available evidence shows the official account promulgated under the defendants' illicit influence is, and plaintiffs allege that it is, false and fraudulent, in furtherance of the conspirac(ies) alleged herein.

### V. The Cover-up.

51. As with the other branches or phases of the conspiracy, wherein a number of John Doe defendants working on different aspects of the organized enablement of the hijacking led by defendants Cheney and Rumsfeld may not have been aware or fully aware of each other's involvement; so too with the cover-up, a complicated operation which those involved have maintained for these seven years, and must continue to see to, indefinitely, on any number of fronts. That is, the skein of misrepresentations, distortions, omissions, contradictions, withheld evidence and outright lies which comprise the fraudulent "official" version, must be and plaintiffs allege that it has been and is assiduously, and fraudulently, maintained by the original perpetrators and various cohorts, who have kept the original conspiracy alive to this day.

52. In particular, the cover-up — beyond the fact that the simulated plane crash at the Pentagon was itself a cover-up — has been concentrated around the purported investigation and analysis of the attack and its supposed background by the 9/11 Commission, formally known as The National Commission on Terrorist Attacks Upon The United States, and the Report it issued in 2004. There, as extensively shown by a number of critics and commentators, this official organ put forth a supposedly comprehensive account of the attacks, the alleged attackers and their history, and various

surrounding events and circumstances, in a version so full of omissions, distortions and outright falsehoods, as to clinch its purpose as a mainstay of the cover-up, in furtherance of the underlying conspiracy alleged herein, and its ongoing success.

53. Thus the Report gives a careful account and description of some of the many warnings the Government received during 2001 about Al Qaeda's intention to attack — in the United States, possibly with hijacked planes. The Report goes on to describe an interview with President Bush, which occurred only after intense negotiations in which the Commissioners acquiesced to White House conditions requiring that defendant Cheney be permitted to accompany the President, and that no record would be kept and no notes taken. There the President earnestly insisted to his Commission interlocutors that no warning of the attack had come. All contradictions were left unexplored, and ignored in the Report.

54. Similarly, defendant Rumsfeld — like the President himself, then-National Security Adviser Condoleezza Rice, Defendant Gen. Richard Myers and others — testified and said in public, repeatedly, that no one in the Government security apparatus ever imagined terrorists suicidally crashing planes into buildings. This claim was also absolutely false. In point of fact, the CIA, the NSA, the FAA and NORAD had planned and trained for just such a possibility. Indeed, the record shows training exercises involving such a potential attack had in fact been carried on at the Pentagon in October, 2000 and May, 2001, and that NORAD had begun planning in July, 2001, for a training exercise in which the premise would be that a hijacked airliner was crashed into the World Trade Center. The 9/11 Commission, however — with the same studied indifference it showed towards the Mineta testimony — failed even to mention these contradictions in its Report, let alone explain them away.

55. In any event, it is in the nature of the acts alleged that the participants would endeavor from the outset to keep their actions — and the meeting of the minds that unleashed them — the deepest and darkest of secrets, forever. Thus the cover-up, even as it continues today, and will be manifest in the litigation of this complaint, was inherently part of the original unlawful agreement, and thereby part of the cause of the injuries and deprivations plaintiffs suffered on 9/11, and continuing injury since that time.

56. As to the overall plot, with its roots in the command positions and unhinged political fantasies and intentions of the two main defendants, Cheney and Rumsfeld, plaintiff alleges that, necessarily, there were multiple meetings of the minds among the various necessary parties in various implicated locations, positions and phases of the action. Indeed, the narrative reflects an evident form of rolling conspiracy, or multiple successive, interlocking, sub-conspiracies, by which defendants and their cohorts maintain and have maintained the original agreement to cover up the original crime(s) of terrorism, and their part in it, to this day.

### VII. **Plaintiffs' Injuries.**

57. The injuries, loss and deprivation of rights suffered by Plaintiff April Gallop, her child and others in the bombing of the Pentagon, however it was accomplished, were the result of terrorism, and terrorist acts, and conspiracy to commit terrorism, and to violate constitutional rights, and they include serious head and brain injuries she and her child both sustained when the ceiling caved in on them, as well as the loss and deliberate denial of their rights involved in their being made innocent victims of the attack. Plaintiff's son, Elisha, has had ongoing problems as he has grown older, associated with injury to his brain, and has required continuing medical care and other special help. Both mother and child have had continuing difficulty, pain and suffering as a result, and sustained need for medical care, and financial and other loss; and they evidently will continue to suffer and to need medical and other assistance for the future.

58. Further, clearly as a result of and in retaliation for her public statement that no airplane wreckage was present in the building after the explosion(s), and for raising other questions, John Doe Department of Defense (DOD) defendants, pursuant to the conspiracy, have wrongfully caused plaintiff to be denied medical care and other benefits she should have received since the attack, and have acted to discourage others from helping her, all to her consequent, actionable loss. Most recently, on being discharged from the Army earlier this year, plaintiff's financial account was closed out with a zero balance. A short time later, however, she was refused service at the VA medical center, on grounds that she supposedly owed the Defense Department more than $14,000; for which no documentation has been provided.

59. The plaintiff and her child also will experience more general loss, pain and suffering, forever, from what was done to them by high officials of their own government, who, attacking the Country and the Constitution, were willing to see her killed, and did see many others, thousands, killed, simply to further crass political designs. They were and are themselves terrorists, in truth, without whose crucial complicity the Al Qaeda attacks would never have occurred.

## PLAINTIFFS' CAUSES OF ACTION

One. **Violation of Constitutional Rights – Bivens**.

**a. Conspiracy.** The defendants engaged in an unlawful conspiracy or series of interlocking conspiracies whereby they and various co-conspirators and others took various concrete steps, pursuant to a meeting of the minds around the objective of facilitating and enabling the terrorist attacks, specifically by de-activating and defaulting various normal defense systems and measures, as described and to be shown, so that the Al Qaeda hijackings and bombings of September 11 could succeed. They thereby helped cause the attacks and the resulting injuries to plaintiff, denial of her fundamental rights under the Fourth, Fifth and Ninth Amendments to the U.S. Constitution, and death and injury loss to so many others; entitling plaintiff to judgment against the defendants under the rule of the *Bivens* case, for compensatory damages in such amount as the Jury may determine; and Punitive Damages.

**b. Deliberate Indifference.** The concerted actions of defendants in their efforts to facilitate and enable the terrorist attacks of September 11 in various ways as described hereinabove and to be shown, and the defendants' deliberate indifference to the likelihood of serious injury and deprivation of rights arising therefrom, resulted in plaintiff and her child being made unknowing, defenseless victims of the attack, and thereby seriously injured and denied fundamental rights under the Fourth, Fifth and Ninth Amendments to the U.S. Constitution, entitling her to judgment against the defendants, under the rule of the *Bivens* case, for compensatory damages in such amount as the Jury may determine; and Punitive Damages.

**c. Retaliation.** The actions taken against plaintiff in retaliation for her speaking out with questions about the official explanations of what happened violated her rights

25

under the First Amendment, entitling her to a further judgment against those responsible for compensatory damages in such amount as the Jury may determine; and Punitive Damages.

Two.  **Common Law Conspiracy to Cause Death and Great Bodily Harm.** The plaintiff is further entitled to judgment against the defendants, jointly and severally, for the injuries she and her child received which were caused by the acts and omissions of defendants and others pursuant to the conspiracy(ies) alleged herein, and by breach of defendants' duty of care towards the plaintiff, for compensatory and punitive damages in such amounts as the Jury may determine, and costs and attorneys fees.

Three.  **Acts of Terrorism Causing Injury** – 18 U.S.Code 2333(a).   The aforesaid acts and omissions of and by defendants were part and parcel of a terrorist attack on the United States, and the Pentagon in particular, resulting from a conspiracy or conspiracies to cause and help cause, facilitate and enable the hijacking and crashing of the planes and other elements of the attack; and these acts resulted in serious injuries to plaintiff and her child, entitling her to judgment against the defendants for compensatory damages as determined by the Jury, treble damages, and Attorneys Fees, under the Terrorism Acts — notwithstanding the provision of Sec.2337, purporting to exempt or immunize U.S. officers and employees acting "within... official capacity or under color of legal authority"; in that the agreements, acts and omissions alleged herein are outside and beyond the reach and compass of any conceivable official capacity or legal authority, actual or colorable, and therefore unconstitutional as applied in this case, as a deprivation of Due Process of Law, and of her right under the Seventh Amendment to have her claim tried by a Jury according to Law.

///

**PRAYER FOR RELIEF**

WHEREFORE, the plaintiff demands Trial By Jury, and Judgment against all defendants, jointly and severally, for compensatory and punitive damages in such amounts as the Jury may see fit to award; treble damages under 18 U.S.C. 2333(a), and costs of suit, expenses and attorneys fees...

DATED: December 15, 2008.

Yours, etc.,

Dennis Cunningham  (DC 7142)
36 Plaza Street
Brooklyn, NY 10238
718-783-3682
denniscunninghamlaw@gmail.com

William W. Veale
2033 North Main Street, #1060
Walnut Creek, CA 94596
925-935-3987
centerfor911justice@gmail.com

27