**HANLY CONROY BIERSTEIN & SHERIDAN LLP**
**Attorneys for Plaintiffs**
**415 Madison Avenue**
**New York, New York 10017**
**(212) 401-7600**
**Paul J. Hanly, Jr. (PH-5486)**
**Jayne Conroy, Esquire (JC-8611)**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NUMBER:
04 CV 7281 (RCC)

| | |
|---|---|
| **Allison Vadhan**, individually and as administratrix of the estate of Kristin White-Gould; | ) )<br>) |
| **William Doyle**, individually and as administrator of the estate of Joseph Michael Doyle; | )<br>) |
| **April Gallop**; | )<br>) |
| **Eugenia Singer**; | )<br>) |
| **Sharon Premoli**; | )<br>) |
| **Joseph Giampa**; | )<br>) |
| **Julio Roig**; | )<br>) |
| **Yvonne V. Abdool**; | )<br>) |
| **Celso Abdool**; | )<br>) |
| **Vanessa Abreu**; | )<br>) |
| **John Acerno**; | )<br>) |
| **Humberto Acosta**; | )<br>) |
| **Kevin Adams**; | )<br>) |
| **Darryl Adone**; | )<br>) |
| **Mark Aiken**; | )<br>) |
| **James Albach Jr.**; | )<br>) |
| **Vincent Albanese**; | )<br>) |

**AMENDED COMPLAINT**

Plaintiffs Demand
a Jury Trial

Yang;                                          )
                                               )
                Plaintiffs,                     )
                                               )
vs.                                            )
                                               )
**Riggs National Corporation,**                )
A Delaware Corporation,                         )
                                               )
-and-                                          )
                                               )
**Riggs Bank, N.A.,**                           )
A whole owned subsidiary of                     )
Riggs National Corporation,                     )
                                               )
                                               )
                Defendants.                     )
_____ )

## COMPLAINT

1.      Plaintiffs Allison Vadhan, William Doyle, April Gallop, Eugenia Singer,

Sharon Premoli, Joseph Giampa and Julio Roig, and the remaining plaintiffs identified

herein ("plaintiffs"), submit this Amended Complaint by their undersigned counsel, and

allege as follows upon personal knowledge as to themselves and their own acts, and as to

all other matters upon information and belief based on, among other things, investigation

by their counsel and others.

## INTRODUCTION

2.      This is an action for damages arising from injuries and/or death suffered

by the plaintiffs and/or their decedents as a result of the negligent, reckless and/or

intentional acts of the defendants, which are United States financial institutions that

utterly failed, despite numerous admonitions, to comply with duties imposed upon them

pursuant to United States anti-money laundering ("AML") statutes and regulations, other

national and international industry standards, and common law.   Because of the

defendants' failures to meet their applicable duties, the defendants did not alert the

124

appropriate United States authorities to suspicious financial transactions that would have provided the authorities information to identify September 11, 2001 terrorists and their activities in their planning stages. Instead, the defendants' failures significantly contributed to concealing the true source and/or destination of funds passing through accounts at Riggs Bank and ultimately being used for the benefit of terrorists, and ultimately facilitated and significantly contributed to the terrorists being able to complete their terrorist deeds on September 11, 2001 by crashing four United States passenger airlines into the New York World Trade Center buildings, the United States Pentagon, and into a field in Shanksville, Pennsylvania, killing and injuring thousands of people on the planes and at the crash sites.

3.      Financing is key to terrorism, corruption, and other criminal acts. Money launderers, terrorists, and other criminals want to be able to transfer funds across international lines, move money quickly, and minimize inquiries into their finances and activities. United States AML laws constitute law enforcement's first defense against the misuse of the United States financial system by money launderers and terrorist financers, and are designed to prevent terrorists and other criminals from using United States financial institutions to commit such crimes. The aim of AML laws is to enlist United States financial institutions in the fight against money laundering. AML laws require financial institutions to refuse to engage in financial transactions involving criminal proceeds, to monitor transactions and report suspicious activity, and to operate active AML programs.

4.      When financial institutions fail to abide by the statutory, regulatory and industry standards applied to them to prevent money laundering, the failures are especially troubling inasmuch as they impede the ongoing battles against terrorism, corruption and other crimes. Here, the defendants' failures impeded the battle against the

financing of terrorism, indeed facilitated such financing, and substantially contributed to terrorists being permitted to evade detection and continue their attack plans against the United States and its citizens, including the plaintiffs and their decedents.

## PARTIES

5.    The plaintiff, Allison Vadhan, resides in and is a citizen of the State of New York and is the representative of the estate of Kristin White-Gould, who died as a result of the terrorist attacks on September 11, 2001.

6.    The plaintiff, William Doyle, resides in and is a citizen of the State of New York and is the representative of the estate of Joseph Michael Doyle, who died as a result of the terrorist attacks on September 11, 2001.

7.    The plaintiff, April Gallop, resides in and is a citizen of the State of Virginia.

8.    The plaintiff, Eugenia Singer, resides in and is a citizen of the State of New York.

9.    The plaintiff, Sharon Premoli, resides in and is a citizen of the State of California.

10.    The plaintiff, Joseph Giampa, resides in and is a citizen of the State of New York.

11.    The plaintiff, Julio Roig, resides in and is a citizen of the State of New Jersey.

12.    The plaintiff, Yvonne Abdool, resides in and is a citizen of the State of New York.

13.    The plaintiff, Celso Abreu, resides in and is a citizen of the State of New York.

2440.   The plaintiff, Nagat Zakhary, resides in and is a citizen of the State of New Jersey and is the representative of the estate of Adel A. Zakhary, who died as a result of the terrorist attacks on September 11, 2001.

2441.   The plaintiff, Robert Zampieri, resides in and is a citizen of the State of New Jersey and is the representative of the estate of Robert Alan Zampieri, who died as a result of the terrorist attacks on September 11, 2001.

2442.   The plaintiff, Jill Zangrilli, resides in and is a citizen of the State of New Jersey and is the representative of the estate of Mark Zangrilli, who died as a result of the terrorist attacks on September 11, 2001.

2443.   The plaintiff, Rui Zheng, resides in and is a citizen of the State of Maryland and is the representative of the estate of Yuguang Zheng, who died as a result of the terrorist attacks on September 11, 2001.

2444.   The plaintiff, Rui Zheng, resides in and is a citizen of the State of Maryland and is the representative of the estate of Shuyin ·Yang, who died as a result of the terrorist attacks on September 11, 2001.

2445.   Defendant Riggs National Corporation ("RNC") is a bank holding company headquartered in Washington, D.C., listed on NASDAQ under the stock symbol RIGS, and incorporated in Delaware.  With the exception of venture capital investing, the Company's activities are conducted through its principal operating subsidiary, Riggs Bank, and its subsidiaries and divisions.

2446.   Defendant Riggs Bank, N.A. ("Riggs Bank") is the principal subsidiary of Riggs Corp., is a national banking association founded in 1836 and organized under the national banking laws of the United States in 1896, and has its principal place of business in the Washington, D.C. metropolitan area and, to a lesser extent, throughout the United States and internationally.  Riggs bank is a "financial institution" as defined in 31 U.S.C.

§ 5312; a "bank" as defined in 31 C.F.R § 103.11 (c); and an "insured bank" as defined in section 3 (h) of the Federal Deposit Insurance Act (12 U.S.C. § 1813 (h)).

2447. Inasmuch as RNC is a holding company that performed its entire embassy banking business through its subsidiary, Riggs Bank, plaintiffs collectively reference RNC and Riggs Bank as "Riggs" or "defendants."

## JURISDICTION AND VENUE

2448. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 408(b)(1)(3) of the Air Transportation Safety and Systems Stabilization Act ("ATSSSA"), Pub. L. No. 107-42, 115 Stat. 230242 (Sept, 22, 2001) (reprinted, as amended, at 49 U.S.C. § 40101 note (West 1993)). This Court also has jurisdiction under 28 U.S.C. § 1332, in that the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and there is diversity of citizenship between the parties. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 for all related claims. Finally, this Court also has personal jurisdiction over the defendants herein.

2449. Venue is appropriate in this forum based on ATSSSA § 408(b)(1)(3).

## FACTUAL ALLEGATIONS

## THE DUTY OF FINANCIAL INSTITUTIONS PURSUANT TO AML LAWS

2450. A financial institution's statutory and regulatory duties are set out in the Bank Secrecy Act ("BSA"), 12 U.S.C. § 1829, 12 U.S.C. §§ 1951-1959 and 31 U.S.C. § 5311 et seq., and the regulations appertaining thereto, 31 C.F.R. Part 103 as amended. Other applicable industry standards support and clarify a financial institution's duties in this regard.

2451. Some of the more general standards implicated involve financial institutions' obligation, and Riggs' duty, in particular, to conduct themselves in conformity with high ethical standards, comply with the laws and regulations applicable

to the industry, avoid use of the bank's services for illegal purposes, and cooperate fully and appropriately with law enforcement authorities.   On these points, the Basel Committee, an international banking standards organization established at the end of 1974 to formulate broad supervisory standards and guidelines and recommend statements of best banking practice in the expectation that individual authorities will take steps to implement them through detailed arrangements best suited to their own national systems, has stated the following principles:

> "Banks' management should ensure that business is conducted in conformity with high ethical standards and that laws and regulations pertaining to financial transactions are adhered to."

> "[B]anks should not set out to offer services or provide active assistance in transactions which they have good reason to suppose are associated with money-laundering activities."

> "Banks should fully cooperate with national law enforcement authorities to the extent permitted by specific local regulations relating to customer confidentiality.  Care should be taken to avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading information. Where banks become aware of facts which lead to the reasonable presumption that money held on deposit derives from criminal activity or that transactions entered into are themselves criminal in purpose, appropriate measures, consistent with the law, should be taken, for example, to deny assistance, sever relations with the customer and close or freeze accounts.

*(Basle Committee, Statement of Principles, reprinted in BSA Manual Section 1501.0 (September 1997), at 2-3.)*

## FEDERAL STANDARDS APPLICABLE TO FINANCIAL INSTITUTIONS, INCLUDING RIGGS

2452.  The BSA and the BSA regulations that the Department of Treasury ("Treasury") has issued apply to all financial institutions, as defined in 31 CFR section 103.11 (n), and specifically apply to banks.  A principal purpose of the BSA is to require financial institutions to maintain appropriate records and file certain reports which are

377

particularly useful in investigating and uncovering money laundering, drug activities, terrorism, and other illegal activities.

2453.  The BSA requires financial institutions operating in the United States, and their directors, to undertake a number of AML efforts to ensure that financial institutions do not become conduits for terrorist financing or criminal proceeds, or facilitators of money laundering.  Key provisions require financial institutions, and their directors to:

(A)  Establish an AML program that includes explicit written policies and procedures which are approved by the banks directors with notation of such approval in the minutes of the directors' meetings;

(B)  Designate an adequate and qualified bank employee as the BSA compliance officer who would have properly performed day-to-day responsibilities for coordinating, monitoring, and all other aspects of the compliance program;

(C)  Properly train its employees as to the requirements of an adequate AML program pursuant to the BSA;

(D)  Establish as internal audit function which allows for independent testing for compliance to be conducted by bank personnel or by an outside party;

(E)  Adequately perform and fulfill "know your customer" requirements;

(F)  Properly monitor and exercise appropriate due diligence with regard to accounts, including high-risk accounts, including accounts for foreign financial institutions and/or accounts for wealthy foreign political figures;

(G)  Properly file reports identifying suspicious activities and identifying currency transactions greater than US$10,000 to guard against money-laundering.

2454.  For example, pursuant to applicable regulations, domestic financial institutions, including banks, must file a report for each single or multiple "deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such

financial institution which involves a transaction in currency of more than $10,000." *31 CFR 103.22 (b) (1)*.

2455. These reports have a high degree of usefulness in criminal, tax, and regulatory investigations and proceedings, as well as in the conduct of intelligence and counterintelligence activities, including analysis, to protect against international terrorism. *See 31 U.S.C. § 5311*.

2456. **An AML program is required**.    In addition to the BSA requiring financial institutions to implement AML procedures, international standards applicable to the industry similarly require implementation of AML procedures.

2457. To the extent that the United States has accepted membership or agreed to implement standards or principles of any organization promulgating such standards or principles, the standards or principles are requirements for financial institutions to conduct business in the United States.    One example of such standard comes from the Financial Action Task Force ("FATF").    FATF is an intergovernmental body originally established by the 1989 Paris G-7 Summit to develop and promote standards and policies to combat money-laundering.    The FATF includes 26 countries and two international organizations, including the major financial center countries of Europe, North America and Asia.

2458. In April 1990 and updated in 1996 and 2003, the FATF issued a set of Forty Recommendations that established a minimum for international AML standards and that has been endorsed by more than 130 countries, including the United States. Among FATF's 40 Recommendations regarding AML laws is Recommendation 19, recommending the following:

> 19. Financial institutions should develop programmes against money laundering and terrorist financing.  These programmes should include:

(i) the development of internal policies, procedures and controls, including appropriate compliance management arrangements, and adequate screening procedures to ensure high standards when hiring employees;

(ii) an ongoing employee training programme....

2459.   Financial institutions must ensure that appropriate bank personnel are trained in all aspects of the regulatory requirements of the BSA and the banks internal BSA compliance and AML policies and procedures.   According to the *Bank Secrecy Act/Anti-Money Laundering Comptroller's Handbook, September 2000, at 6-7,* an effective training program includes provisions to ensure that:

- All bank personnel, including senior management, who have contact with customers (whether in person or by phone), who see customer transaction activity, or who handle cash in any way, receive appropriate training. Those employees include persons involved with branch administration; customer service; lending; private, or personal banking; correspondent banking (international and domestic); trust; discount brokerage; funds transfers; safe deposit/custody; and vault activities.

- Training is ongoing and incorporates current developments and changes to the BSA, anti-money laundering laws, and OCC and FinCEN regulations. New and different money laundering schemes involving customers and financial institutions should be addressed.  It also should include examples of money laundering schemes and cases, tailored to the audience, and in ways in which such activities can be detected or resolved.

- Training focuses on the consequences of an employee's failure to comply with established policy and procedures (e.g., fines or termination). Programs should provide personnel with guidance and direction in terms of banking policies and available resources.

2460.   **"Know Your Customer" standards must be met**.  At all relevant times, the standard within the financial institution industry has been to have "Know Your Customer" practices to insure the immediate detection and identification of suspicious activity. *(BSA Manual Section 601.0 (September 1997), at 1.)*  In its 1988 Statement of Principles, the Basel Committee stated the following principle regarding the "Know Your Customer" policy:

> "With a view to ensuring that the financial system is not used as a channel for criminal funds, banks should make reasonable efforts to determine the true identity for all customers requesting the institution's services."

*(The Basle Committee, Prevention of Criminal Use of the Banking System for the Purpose of Money-Laundering, Statement of Principles (December 1988), reprinted in BSA manual Section 1501.0 (September 1997), at 3.)*

2461. In addition to identifying a customer, an integral part of an effective "Know Your Customer" policy is a comprehensive knowledge of the transactions carried out by the customers of the financial institution. Therefore, it is necessary that the "Know Your Customer" procedures established by the institution allow for the collection of sufficient information to develop a "customer profile." The primary objective of such procedures is to enable the financial institution to predict with relative certainty the types of transactions in which a customer is likely to be engaged. The profile should allow the financial institution to understand all facets of the customer's intended relationship with the institution, and, realistically, determine when transactions are suspicious or potentially illegal. *(BSA Manual Section 601.0 (September 1997), at 2.)*

2462. **Due Diligence is necessary when opening and maintaining accounts**, including enhanced due diligence necessary for high-risk accounts. Recommendation 21 of the FATF 40 Recommendations provides:

> 21. Financial institutions should give special attention to business relations and transactions with persons, including companies and financial institutions, from countries which do not or insufficiently apply these Recommendations. Whenever these transactions have no apparent economic or visible lawful purpose, their background and purpose should, as far as possible, be examined, the findings established in writing, and be available to help supervisors, auditors and law enforcement agencies.

2463. The Saudi Embassy accounts constitute high-risk accounts warranting enhanced scrutiny. Although it was not Riggs' practice to exercise such enhanced scrutiny regarding embassy accounts, the bank was particularly situated to do so. Riggs has been a leader in the specialized banking industry known as embassy banking, having

opened and administered accounts for more than 95% of the more than 160 foreign
missions and embassies in Washington, D.C. Until Riggs eliminated its embassy banking
business in the spring of 2004, the bank's diplomatic business accounted for
approximately 23 percent of Riggs' $4.2 billion in deposits. *(See Glenn R. Simpson,
"U.S. 'Bank of Presidents' Stumbles Amid a Terrorism-Fund Probe," The Asian Wall
Street Journal, April 8, 2004.)*

2464.  Offering guidance regarding the process of determining when increased
scrutiny is necessary, the FATF has recommended the following in its Guidance for
Financial Institutions in Detecting Terrorist Financing:

> Determining when increased scrutiny is necessary?
>
> 7. Financial institutions are encouraged to develop practices and
> procedures that will help to detect and deter those transactions that may
> involve funds used in terrorist financing.  The increased scrutiny that may
> be warranted for some transactions should be seen as a further application
> of the institution's due diligence and anti-money laundering policies and
> procedures and should lead, when appropriate, to reporting of such
> financial activity as suspicious or unusual under applicable transaction
> reporting regimes for a particular jurisdiction.
> …
>
> [Financial institutions] should ascertain whether transactions are unusual,
> suspicious or otherwise indicative of criminal or terrorist activity.

*(FATF Guidance for Financial Institutions in Detecting Terrorist Financing, at 2-3.)*

2465.  The FATF cautions that the methods terrorists use to secure funds is
generally the same as other criminals engaged in money-laundering schemes:

> Laundering of terrorist related funds
>
> 15. From a technical perspective, the methods used by terrorists and their
> associates to generate funds from illegal sources differ little from those
> used by traditional criminal organisations.  […]  It follows then that
> terrorist groups must similarly find ways to launder these funds in order to
> be able to use them without drawing the attention of authorities.  In
> examining terrorist related financial activity, FATF experts have
> concluded that terrorists and their support organisations generally use the
> same methods as criminal groups to launder funds.  Some of the particular

methods detected with respect to various terrorist groups include: cash smuggling (both by couriers or bulk cash shipments), structured deposits to or withdrawals from bank accounts, purchases of various types of monetary instruments (travellers' cheques, bank cheques, money orders), use of credit or debit cards, and wire transfers. There have also been indications that some forms of underground banking (particularly the hawala system) have had a role in moving terrorist related funds.

*(FATF Guidance for Financial Institutions in Detecting Terrorist Financing, at 5.)*

2466. Banks must have a written policy to identify and follow up on unusual or suspicious activities. In the OCC's "Bank Secrecy Act/Anti-Money Laundering Handbook" the OCC provides examples of suspicious activities that should alert institutions to the need for further investigation. Some examples of unusual or suspicious activities may include:

1.  Account transactions or other activities that are inconsistent with the customer's business or the account's due diligence file.

    - Numerous accounts opened for a particular business with frequent transactions among the accounts.

    - Numerous cash deposits or withdrawals inconsistent with the customer's business.

    - Numerous cash purchases of traveler's checks, money orders, cashier's checks or wire transfers, or deposits of same into customer's accounts, inconsistent with the customer's business.

    - Sudden and inconsistent changes in transaction patterns from the customer's normal activities.

2.  Account transactions or other activities that seek to avoid reporting or record-keeping requirements.

    - A business or new customer that asks to be exempted.

    - A customer who is reluctant to provide necessary report information or to proceed with the transaction after being informed that a report must be filed.

    - Numerous currency deposits or withdrawals in teller or ATM transactions that appear to be intended to keep such transactions under reporting thresholds.

3.  Wire, pass-through, and in-and-out transactions.

- International wire transfer activity, particularly to or from financial-secrecy haven countries, without an apparent business reason or that is inconsistent with customer history.

- Large, round-dollar amounts.

- Funds transferred in and out of an account on the same day or within a short period.

2467.  **Reporting is required**.  Pursuant to the Bank Secrecy Act, 31 U.S.C. § 5311 to § 5324, the Secretary of the Treasury has prescribed regulations governing financial institutions' obligations to report currency transactions.  31 U.S.C. § 5313.  In prescribed circumstances, financial institutions, including the defendants, must file Suspicious Activity Reports (Treasury Department Form 90-22.47), pursuant to section (a) of 31 CFR 103.18 (Treasury), 12 CFR § 21.11 (OCC), 12 CFR §§ 208.60 and 208.62 (Federal Reserve), 12 CFR §§ 353.1 and 351.3 (FDIC) and 12 CFR § 563.180 (OTS) and Currency Transaction Reports (IRS Form 4789), pursuant to 31 CFR § 103.22.

2468.  For Example, Section (a) of 31 CFR 103.18 requires the following regarding Suspicious Activity Reports (Treasury Department Form 90-22.47):

(1) Every bank shall file with the Treasury Department, to the extent and in the manner required by this section, a report of any suspicious transaction relevant to a possible violation of law or regulation.  A bank may also file with the Treasury Department by using the Suspicious Activity Report specified in paragraph (b)(1) of this section or otherwise, a report of any suspicious transaction that it believes is relevant to the possible violation of any law or regulation but whose reporting is not required by this section."

(2) A transaction requires reporting under the terms of this section if it is conducted or attempted by, at, or through the bank, it involves or aggregates at least $5,000 in funds or other assets, and the bank knows, suspects, or has reason to suspect that:

(i) The transaction involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation;

(ii) The transaction is designed to evade any requirements of this part or of any other regulations promulgated under the Bank Secrecy Act, Pub.L. 91-508, as amended, codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-1959, and 31 U.S.C. §§ 5311-5330; or

(iii) The transaction has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the bank knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction.

2469.  Section (b) of 31 CFR § 103.18 requires a bank to file a Suspicious Activity Report "within 30 days no later than 30 calendar days after the date of initial detection by the bank of facts that may constitute a basis for filing a SAR."[1]

2470.  Regarding Currency Transaction Reports (IRS Form 4789), 31 CFR 103.22 requires the following:

(b) (1)  Each [bank] … shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000, except as otherwise provided in this section.
…
(c) (2)  … [F]or purposes of this section, multiple currency transactions shall be treated as a single transaction if the financial institution has knowledge that they are by or on behalf of any person and result in either cash in or cash out totaling more than $10,000 during any one business day (or in the case of the Postal Service, any one day).  Deposits made at night or over a weekend or holiday shall be treated as if received on the next business day following the deposit.

2471.  Section (a) (1) of 31 CFR 103.27 requires a bank to file a Currency Transaction Report within 15 days of a reportable transaction.

## RIGGS BREACHED ITS DUTIES IMPOSED BY STATUTES, REGULATIONS AND INDUSTRY STANDARDS

---

1 "If no suspect was identified on the date of the detection of the incident requiring the filing, a bank may delay filing a SAR for an additional 30 calendar days to identify a suspect.  In no case shall reporting be delayed more than 60 calendar days after the date of initial detection of a reportable transaction.  In situations involving violations that require immediate attention, such as, for example, ongoing money laundering schemes, the bank shall immediately notify, by telephone, an appropriate law enforcement authority in addition to filing timely a SAR."

2472.     Since as far back as into the early 1980's and at least since 1997, Riggs has disregarded its AML obligations, maintained a dysfunctional AML program despite frequent warnings from OCC regulators, and allowed, or at times, actively facilitated suspicious financial activity, all in violation of duties imposed upon Riggs by statutes, regulations and industry standards.

2473.     The following are examples evidencing Riggs' pattern of conduct demonstrating a systemic failure to apply AML laws within Riggs.

A.     Pattern of Conduct Demonstrated by Assistance to Former Nicaraguan Ambassador.

Between September and December 1982, the former Nicaraguan Ambassador to the United States, Francisco Fiallos, made three unauthorized withdrawals from the Nicaraguan embassy account at Riggs Bank totaling $668,000. The Foreign Minister of Nicaragua, Miguel D'Escoto and embassy officials in Washington told the Washington Post that Riggs Bank knew that the account was emptied by Fiallos but withheld the information until late December, at which point Fiallos had fled into exile in Costa Rica. *(See Karen DeYoung, "Nicauragua, Ex-Envoy Dispute Missing $668,000," The Washington Post, January 8, 1983, p. A1.)*

B.     Pattern of Conduct Demonstrated by Assistance to Colombian Cocaine Ring.

In December 1983, former Riggs Bank vice president William G. Hessler was charged "in connection with an alleged scheme involving money laundering, racketeering, mail fraud and the importation and distribution of cocaine from Colombia." *(See Al Kamen, "15 Indicted in Alleged Drug Ring," Washington Post, December 10, 1983.)*

A federal grand jury found that Washington lobbyist Fred B. Black, Jr. and Lawrence G. Strickland had run a "complex, sophisticated and lucrative cocaine ring." The men collaborated with Riggs Bank senior executive William Hessler to launder "more than $1 million of drug money through the Riggs bank" via Fred Black's Riggs' accounts at the Watergate Riggs branch in downtown Washington, DC. Hessler and Riggs Bank actively participated in the scheme by wiring hundreds of thousands of dollars in laundered money from Riggs Bank to accounts at Guarantee Bank in Atlantic City, New Jersey. *(See Id.)*

Hessler permitted Black to make deposits of large amounts of cash into a "shell corporate account in the name of Dunbar Management"  without

complying with federal currency regulations. The Riggs executive also gave Black loans of more than $150,000 without authorization from senior bank officials. *(See Id.)*

C.    Pattern of Conduct Demonstrated by 1985 Fines For Non-Compliance With BSA Laws.

In 1985, the United States government issued heavy penalties against Riggs Bank for non-compliance with federal banking laws under the Bank Secrecy Act. In October 1985, Riggs Bank was fined $269,750 by the United States Treasury Department for 1,226 violations of laws requiring the reporting of large and suspicious currency transactions. *(See Robert Garsson and Nina Easton, "Riggs fined after currency violations," American Banker, October 14, 1985)* After Riggs was penalized for its non-compliance with anti-money laundering regulations in 1985, the bank stated through a spokesman that the violations occurred because the requirements were misunderstood, not because of any attempt to hide money. The spokesman emphasized, "What we have done since this is to establish tighter procedures for employee training." *(See Id.)*

D.    Pattern of Conduct Demonstrated by Assistance to Former District of Columbia Government Economic Official.

In November 1987, Hugh D. Mason III, a former District of Columbia government economic development official, was indicted by a federal grand jury on charges of bank fraud, bank larceny, and theft in connection with an alleged scheme in which he stole nearly $25,000 in government checks and laundered the money through a secret account at Riggs Bank in the name of a company with which he was affiliated, Pace Setters Management, Inc. (*See Nancy Lewis and Sharon LaFraniere, "Ex-D.C. Official Indicted in Bribery, Fraud Cases," The Washington Post, November 5, 1987.)*

In opening the unauthorized corporate account at Riggs Bank, Mason incorrectly stated that he was the president of the company and fraudulently endorsed each check with his and the company's name. *(See Id.)*

E.    Pattern of Conduct Demonstrated by 1997 OCC Citation for BSA Compliance Program Deficiencies.

In 1997, Riggs Bank was cited by the Office of the Comptroller of the Currency (OCC) for deficiencies in its Bank Secrecy Act compliance program. As the OCC Deputy Chief Counsel described to Congress in June 2004: "The types of deficiencies that were flagged at the time tended to have to deal with the individual elements of a compliance program, in other words, training, internal controls, testing, et cetera." *(See Testimony of Daniel Stipano, Deputy Chief Counsel, Office of the Comptroller of the Currency, U.S. Treasury Department, before the House Committee on*

387

*Financial Services: Subcommittee on Oversight and Investigations, June 2, 2004.)* In June 2004, United States Representative Sue Kelly characterized Riggs Bank's response to the 1997 regulatory action, stating, "[T]here were some areas of concern, and it didn't improve and it continued not to improve."

F.    Pattern of Conduct Demonstrated by Assistance to Mexican Drug Cartel Associate.

In 1998, an account held by Mexican drug lord Amado Carrillo Fuentes's drug cartel at Riggs National Corporation's Miami bank unit was used by a Fuentes associate, Ricardo Reyes Rincon, to funnel $120,000 in illegal drug money to Chilean businessman Alejandro Ventura, to finance a real estate purchase in Chile. *(See Jose de Cordoba and Laurie Hays, "How Money Laundering Hit a Wealthy Family: Chilean Clan's Millions were frozen in Citibank by the US," The Wall Street Journal, May 6, 1998.)*

Fuentes and his global cocaine cartel fled to South America in the mid-1990s after their base of operations in Mexico was disrupted. The money was routed from Ricardo Reyes through the Riggs account in Miami and back to an account in Chile in the name of Mr. Ventura's money-exchange house. *(See Id.)*

G.    Pattern of Conduct Demonstrated by Assistance to Former Chilean President, Augusto Pinochet.

From 1994 until 2002, Riggs Bank opened at least six accounts and issued several certificates of deposit (CDs) for Augusto Pinochet, former President of Chile, while Pinochet was under house arrest in the United Kingdom and his assets were the subject of court proceedings. The aggregate deposits in the Pinochet accounts at Riggs ranged from $4 to $8 million at a time. The bank's leadership directly solicited the accounts from Mr. Pinochet, and Riggs account managers took actions consistent with helping Pinochet to evade legal proceedings seeking to discover and attach his bank accounts. Riggs opened multiple accounts and accepted millions of dollars in deposits from Pinochet with no serious inquiry into questions regarding the source of his wealth; helped him set up offshore shell corporations and open accounts in the names of those corporations to disguise Pinochet's control of the account's; altered the names of his personal accounts to disguise their ownership; transferred $1.6 million from London to the United States while Pinochet was in detention and the subject of a court order to attach his bank accounts; conducted transactions through Riggs' own accounts to hide Pinochet's involvement in some transactions; and delivered over $1.9 million in cashiers checks to Pinochet in Chile to enable him to obtain cash payments from banks in that country.

Riggs also concealed the existence of Pinochet's accounts from OCC bank examiners for two years, initially resisted OCC requests for information,

and closed the accounts only after a targeted OCC examination in 2002. In July 2002, the OCC examiner-in-charge at Riggs gave the OCC examiners of the Pinochet accounts the highly unusual instructions to exclude from the OCC's electronic files regarding Riggs the examiners memorandum or supporting workpapers regarding their examination of Riggs' Pinochet accounts. About one month later, the OCC examiner-in-charge who gave the unusual instruction accepted a job at Riggs.

Finally, under investigation by the Justice Department for violations of AML laws regarding the Pinochet accounts, Riggs entered a plea agreement in or about January 2005, admitting that, from at least March 1999 through December 2003, Riggs knowingly and willfully failed to report suspicious transactions, failed to report suspicious transactions in a timely manner and failed to report suspicious transactions in an accurate manner, as required by United States AML laws.

H.    Pattern of Conduct Demonstrated by Assistance regarding Equatorial Guinea Accounts

From 1995 until 2004, Riggs Bank administered more than 60 accounts and CDs for the government of Equatorial Guinea (E.G.), E.G. government officials, or their family members. By 2003, the E. G. accounts represented the largest relationship at Riggs Bank, with aggregate deposits ranging from $400 to $700 million at a time. Riggs Bank serviced the E.G. accounts with little or no attention to the bank's anti-money-laundering obligations, turned a blind eye to evidence suggesting the bank was handling the proceeds of foreign corruption, and allowed numerous suspicious transactions to take place without notifying law-enforcement. For example, Riggs opened multiple personal accounts for the President of E.G., and his wife, and other relatives; and helped establish shell offshore corporations for the E.G. President and his sons; and over a three-year period, from 2000 to 2002, facilitated nearly $13 million in cash deposits into Riggs accounts controlled by the E.G. President and his wife. On two of those occasions, Riggs accepted without due diligence $3 million in cash deposits for an account opened in the name of E.G. President's offshore shell corporation, Otong, S.A.

In addition, Riggs opened an account for the E.G. government to receive funds from oil companies doing business in Equatorial Guinea, under terms allowing withdrawals with two signatures, one from the E.G. President and the other from either his son, the E.G. Minister of Mines, or his nephew, the E.G. Secretary of State for Treasury and Budget. Riggs subsequently allowed wire transfers withdrawing more than $35 million from the E.G. government account, wiring the funds to counties which were unknown to the bank and had accounts in jurisdictions with bank secrecy laws. At least one of these recipient companies is believed to be controlled in whole or in part by the E.G. President. When, in 2004, the bank requested more information about the two companies from the E.G. President, he declined to provide it, except to say the wire transfers to them had been authorized.

The senior leadership at Riggs Bank were well aware of the E.G. accounts and met on several occasions with the E.G. President and other E.G. officials. The bank leadership permitted the account manager handling the E.G. relationship to become closely involved with E.G. officials and business activities, including advising the E.G. government on financial matters and becoming the sole signatory on an E.G. account holding substantial funds. The bank exercised such a lax oversight of the account managers activities that, among other misconduct, the account manager was able to wire transfer more than $1 million from the E.G. oil account at Riggs to another bank for an account opened in the name of Jadini Holdings, an offshore corporation controlled by the account manager's wife.

Riggs failed to cooperate initially with requests from the United States Senate Permanent Subcommittee on Investigations for information about the E.G. accounts, identifying only about half the E.G. accounts at the bank and producing limited account documentation and electronic mail. The Subcommittee later learned that the bank failed to designate the E.G. accounts as high risk accounts until October 2003, and did not subject them to additional scrutiny despite obvious warning signs, such as the involvement of foreign political figures, a country with a culture of corruption, and frequent high dollar transactions, the bank also failed to monitor or report suspicious activity in the E.G. accounts. The bank has since closed these accounts.

Finally, under investigation by the Justice Department for violations of AML laws regarding the E.G. accounts, Riggs entered a plea agreement in or about January 2005, admitting that, from at least March 1999 through December 2003, Riggs knowingly and willfully failed to report suspicious transactions, failed to report suspicious transactions in a timely manner and failed to report suspicious transactions in an accurate manner, as required by United States AML laws.

I.      United States Senate Permanent Subcommittee on Investigations Investigation Concluded that, Despite Repeated Admonitions, Riggs' Had a Dysfunctional AML Program

On July 15, 2004, after an investigation into Riggs' AML program, the United States Senate Permanent Subcommittee on Investigations of the Committee on Governmental Affairs issued a report that concluded that Riggs' treatment of the Pinochet and E.G. accounts were the product of Riggs' dysfunctional AML program with long-standing, major deficiencies.  These deficiencies included the inability readily to identify all of the accounts associated with a particular client, the absence of any risk assessment system to identify high risk accounts, inadequate client information, the lack of an established policy for handling accounts associated with foreign political figures, the failure to provide enhanced monitoring of high risk accounts, the failure to monitor wire transfer activity, the failure to detect and report suspicious activity, untimely and

incomplete internal audits, and inadequate AML training. These major AML deficiencies were repeatedly identified in regulatory examinations and internal audits since at least 1997, and Riggs repeatedly promised to correct them, but failed to do so.

2474. <u>The following paragraphs demonstrate Riggs' failure to perform its duties generally and regarding the Saudi Arabian accounts at Riggs.</u>

2475. Riggs failed to have, implement, maintain, and/or enforce the necessary AML program required by law.

2476. Robert Serino, former director for enforcement at the Office of the Comptroller of the Currency, has stated "It looks to me like [Riggs Bank] had a total breakdown in the anti-money laundering systems—if they had any." *(See Statement by Robert Serino, former director for enforcement at the Office of the Comptroller of the Currency, quoted in "Probe of Saudi Embassy Widens as Bank Activity is Scrutinized," January 14, 2004.)*

2477. Based on the inadequate AML system reportedly in place, Riggs failed its duties to comply with AML laws. In testimony before the House Committee on Financial Services, Daniel Stipano, OCC's Deputy Chief Counsel, testified:

> We have, again, a requirement that all banks have a compliance program. And among the things that is required as part of a compliance program are satisfactory internal controls. That would include due diligence procedures for all accounts, and enhanced due diligence procedures for high-risk accounts. The ... Saudi Embassy is a high-risk account. ... [First, Riggs Bank] should have had better systems in place so that they knew the number of accounts that they have. Secondly, they needed to have better information on how those accounts would be used, what the sources of funds would be, where the funds would go?

*(See Testimony of Daniel Stipano, Deputy Chief Counsel, Office of the Comptroller of the Currency, U.S. Treasury Department, before the House Committee on Financial Services: Subcommittee on Oversight and Investigations, June 2, 2004.)*

2478. During the pre-September 11th years between 1997-2001, when al Qaeda was preparing its suicidal hijacking plot against the United States, and charities alleged to be fronts for al Qaeda terrorist financing networks were receiving large monetary

payments from the Saudi Embassy through accounts at Riggs Bank, the Department of
Treasury found:

> Deficiencies with the [Riggs Bank's] BSA compliance program at every
> exam…And we brought these problems to the attention of bank management
> and the board. They were discussed during the exams. They were written up in the
> exam reports, and we secured what we believed was a commitment from bank
> management to fix them. What happened is really what I would term more
> accurately as foot dragging…The bank management did not follow on these
> changes as quickly as they needed to. And, hence, there were repeat violations.

*(See Testimony of Daniel Stipano, Deputy Chief Counsel, Office of the Comptroller of the
Currency, U.S. Treasury Department, before the House Committee on Financial
Services: Subcommittee on Oversight and Investigations, June 2, 2004.)*

But as United States Representative Sue Kelly stated in June 2004 describing Riggs'
response to the 1997 regulatory action, "[T]here were some areas of concern, and it didn't
improve and it continued not to improve."

2479.  Throughout the 1990s, despite Riggs knowing it had repeatedly failed to
comply with various AML laws and standards, it facilitated Saudi Embassy account
payments to individuals without proper verification and due diligence in determining the
destination of the payments. "Riggs accepted a risk here that goes with the handling of
funds with their origins from other countries. But with that risk comes a duty to carefully
review transactions involving either large amounts of money or suspicious circumstances.
Riggs apparently disregarded that duty." *(See Statement of Senator Richard Shelby,
Senate Banking Committee Chairman, "Analysis: Riggs Bank is accused of failing to
alert authorities of possible suspicious activity in its banks," NPR: Morning Edition,
April 29, 2004.)*

2480.  With little or no regard for compliance with AML laws, Riggs assisted
Princess Haifa bint Faisal, the wife of the Saudi Ambassador to the United States, Prince
Bandar Bin Sultan Bin Abdul Aziz Al Saud, in the non-conforming practice of regularly
providing "Riggs with a list of beneficiaries, some of whom receive monthly stipends….

The applicants submit requests, and if they are approved, Riggs sends cashier checks based on the princess' list to the named recipients." *(See Richard A. Serrano, Doyle McManus, and Greg Krikorian, "Saudis Call Any Aid to Terrorists Unwitting," Los Angeles Times, November 24, 2002; see also Sen. Bob Graham, Intelligence Matters: The CIA, the FBI, Saudi Arabia, and the Failure of America's War on Terror, at 168 [hereinafter, Graham, at ___].)*

2481.   Riggs carried out these transactions for the Saudi Embassy on high risk accounts without satisfying the necessary due diligence and Know Your Customer requirements.

2482.   Riggs continued this practice even after receiving the OCC's 1997 citations for failure to comply with monitoring and Know Your Customer standards.

2483.   Riggs failed to file the necessary reports as required by law.

2484.   "Any time you have suspicious money movements, and it's not reported as needed, it hurts our overall [counterterrorism] efforts." *(See quote from unnamed senior counterterrorism official in "Terror Watch: Tangled Ties," Newsweek, April 7, 2004.)*

2485.   In a Consent Order agreed to between OCC and Riggs Bank, Treasury found, and Riggs Bank conceded, that:

> …The Bank did not detect or investigate suspicious activities and did not file SARs as required.  In particular, the Bank failed to refer specific inquiries from law enforcement to the area that investigated suspicious activities to determine whether SAR filings were appropriate;
>
> [The Bank did not] file accurate Currency Transaction Reports and SARs, in part, based upon inaccurate or incomplete information maintained about Bank customers;
>
> …[The Bank did not] investigate suspicious activities occurring in accounts related to the countries of Saudi Arabia and Equatorial Guinea.

*(See Consent Order of Civil Money Penalty, United States of America Department of the Treasury, Office of the Comptroller of the Currency, in the matter of Riggs Bank, N.A., McLean, Virginia, May 13, 2004.)*

2486. As a result of its ongoing investigation into the pervasive and willful negligence of Riggs to comply with its years-long investigative and regulatory measures, the Comptroller of the Currency:

> [C]oncluded that the Bank engaged in systemic violations of law, regulations, and a final order and failed to correct these violations. The Bank failed to comply fully with the requirements of the Consent Order against the Bank dated July 16, 2003. *(See Id.)*

2487. The OCC ordered Riggs Bank to pay a civil monetary penalty in the amount of $25 Million on May 13, 2004.

2488. On July 15, 2004, in response to the OCC order, Riggs Bank N.A. president and CEO Lawrence I. Herbert, testifying under oath before the Senate Government Affairs Subcommittee on Permanent Investigations, admitted full responsibility for the bank's non-compliance with federal banking laws. Under sworn testimony, Mr. Herbert told the Senate Subcommittee that:

> Looking back, it is clear that Riggs did not accomplish all that it needed to. Specifically, with respect to the improvements that were outlined by the Office of the Comptroller of the Currency ("OCC") in its examinations. Riggs deeply regrets that it did not more swiftly and more thoroughly complete the work necessary to meet fully the expectations of its regulators. For this the bank accepts full responsibility.

> ...Over the past six to seven years, OCC examiners have commented on various aspects of BSA and anti-money laundering efforts by the Bank. The Bank took actions in response but, regrettably, did not fully meet the OCC's expectations.

> ...The OCC noted flaws in the Bank's BSA compliance program and was critical of Riggs for not implementing remediation efforts as promptly as the Bank or the OCC would have preferred.

> ... OCC examinations conducted in early 2004 noted that, despite the Bank's efforts, the Bank did not fully satisfy the 2003 Consent Order. As a consequence, the Bank currently is subject to additional regulatory orders and has paid a civil money penalty.

*(See Sworn Congressional Testimony of Lawrence I. Herbert, President and CEO, Riggs Bank N.A., before the Senate Government Affairs Subcommittee on Permanent Investigations, July 15, 2004.)*