2489.  Additionally, according to the Senate Finance Committee Chair, Senator Charles R. Grassley,  Saudi Embassy accounts at Riggs were used for "suspicious activity" payments for Saudi citizens' flight training in the United States and for payments to Islamic groups suspected of supporting terrorism.

2490.  The Saudi accounts at Riggs bank were used to make payments to the American Muslim Council of Alexandria, Virginia, whose former president, Abdurrahman Alamoudi, is currently jailed on charges of violating terrorism sanctions.

## THE NEXUS BETWEEN RIGG'S FAILURES AND THE DAMAGE CAUSED BY THE SEPTEMBER 11 HIJACKERS.

2491.  Riggs' constant failure to comply with banking oversight laws, resulted in financial support from high risk Saudi Embassy accounts at Riggs Bank being provided to and used by at least two September 11th hijackers -- Nawaf al-Hazmi and Khalid al-Mihdhar.  *(Graham, at 168-169, 202, 229.2.)*

2492.  Nawaf al-Hazmi and Khalid al-Mihdhar, two of the hijackers of AA Flight 77, had already, as of at least January 2000, been identified by United States intelligence as terrorist operatives, having been involved in providing logistical support for the near simultaneous bombings of the United States embassies in Kenya and Tanzania that killed 224 people and injured more than another 5,000 people.  *(Graham, at 3-4.)*  Though the United States government did not do so, the intelligence developed on al-Mihdhar, by January 2000, had developed sufficiently to nominate al-Mihdhar to the State

---

2 Senator Graham is serving his third term in the United States Senate, were he has served ten years on the Senate Select Committee on Intelligence, including eighteen months as chairman in 2001-2002, during which he co-chaired the House-Senate Joint Inquiry into the intelligence community and the events of September 11, 2001.  Senator Graham's assertions are significant not merely because of the breadth of information he had available due to his position on the Senate Intelligence Committee, but also because of the tedious note-taking habits for which the Senator is known.  Senator Graham advises that his comments regarding his experiences referenced herein are reconstructed from his memory as well as from the notes contained in the more than 2,100 notebooks he has kept.  (Graham, at xvi.)

department's watch list, permitting him to be refused entry into the United States or denying him another visa. *(Graham, at 7.)*

2493.    On January 15, 2000, Nawaf al-Hazmi and Khalid al-Mihdhar entered the United States together through Bangkok, Thailand to Los Angelos, California. *(Graham, at 10.)*

2494.    Omar Al-Bayoumi was a Saudi national who lived in the suburbs east of San Diego, California.  According to Sen. Bob Graham, former Chairman of the Senate Intelligence Committee, al-Bayoumi served Saudi Arabia as a spy.  Al-Bayoumi worked as an unpaid building manager in the Al-Madina al-Munawara mosque in the town of el Cajon, received $2,800 per month that he claimed came from relatives in India, and knew many people in the surrounding Muslim community.  According to associates, if al-Bayoumi vouched for you, you would be accepted.  Upon their arrival, al-Bayoumi vouched for Nawaf al-Hazmi and Khalid al-Mihdhar. *(Graham, at 11-12, 167, 169, 225.)*

2495.    During the last week of January 2000, al-Bayoumi told associates he was traveling from San Diego to Los Angeles to pick up visitors.  Al-Bayoumi then traveled to Los Angeles and first met with a man at the Saudi consulate who has since been banned from the United States because of his suspected terrorism ties, and then he traveled a distance to the one of over 134 Middle Eastern restaurants in Los Angeles where he met the two terrorist hijackers, Nawaf al-Hazmi and Khalid al-Mihdhar. *(Graham, at 12-13.)*

2496.    During the meeting, al-Bayoumi offered to help Nawaf al-Hazmi and Khalid al-Mihdhar with their living arrangements in San Diego.  Nawaf al-Hazmi and Khalid al-Mihdhar accepted the offer and relocated to San Diego, initially accepting al-Bayoumi's further offer to live in al-Bayoumi's home until they could find an apartment. *(Graham, at 13, 18.)*

2497.  Al-Bayoumi further offered to supplement the funds that the two hijackers were receiving from unidentified sources.  One week later, al-Bayoumi secured for Nawaf al-Hazmi and Khalid al-Mihdhar a six-month lease, for which al-Bayoumi paid the first two months -- over $1,500 total, on an apartment in the Parkwood complex, nearly directly across the street from the apartment that al-Bayoumi himself had recently begun to occupy.  *(Graham, at 18-19.)*

2498.  Within the coming weeks, al-Bayoumi threw a party for Nawaf al-Hazmi and Khalid al-Mihdhar, signaling their acceptance and providing them with contacts within the Saudi community within San Diego.  *(Graham, at 19.)*

2499.  Al-Bayoumi also served as a conduit for huge sums of money from the Kingdom of Saudi Arabia to the United States.  The Joint Congressional Committee final report released in July 2003 stated that al-Bayoumi "had access to seemingly unlimited funding from Saudi Arabia."  In addition, he had an approximated $2,800 per month income, plus monthly "allowances" of $465 from a "ghost job" he held since 1993 with the Saudi aviation services company, Ercan, which in turn contracted with Dallah Avco Aviation, a Saudi government contractor owned by Saleh Kamel, a wealthy Saudi who is alleged to be a financial supporter of Osama bin Laden and al-Qaeda.  *(Graham, at 167.)*

2500.  During his "employment" at Ercan, Al-Bayoumi showed up for work only once, a fact that led his supervisor to complain that he should be fired. The supervisor was reportedly told that Ercan's contract would be terminated if they didn't continue al-Bayoumi on the payroll. In fact, it is reported that in 1999, when another attempt was made to end al-Bayoumi's employment, the director general of Saudi Civil Aviation--in a letter marked "extremely urgent"---made it clear that the government wanted al-Bayoumi's contract renewed "as quickly as possible." *(Graham, at 167.)* The FBI also found that his salary while working for the Saudi Aviation Authority was approved by the

father of another al Qaeda figure. *(See Gary Fields, The Wall Street Journal, July 25, 2003.)*

2501. In March 2000, a month after al-Bayoumi began assisting the two terrorist hijackers assimilate into their life in San Diego, al-Bayoumi's monthly allowances from the job for which he never showed at Ercan rose eight-fold from $465 to $3,700 per month. They remained at that level until December 2000, when one of the terrorist hijackers, al-Hazmi left for Arizona. During the time from March 2000 to December 2000, al-Bayoumi received nearly $30,000 more than he ordinarily would have received for the job that he never attended. *(Graham, at 167.)*

2502. Al-Bayoumi also had a steady stream of income through transfers from Majeda Ibrahim Ahmed al Dweikat, the wife of Osama Bassnan. Bassnan is a known al Qaeda sympathizer who "celebrated the heroes of September 11th" and talked about "what a wonderful and glorious day it had been." Bassnan was suspected to be a Saudi spy being groomed to replace al-Bayoumi. *(Graham, at 24.)* Bassnan was deported from the United States after the September 11th attacks on visa violations and is likely living in Saudi Arabia. *(See Id.; Toby Eckert and Marcus Stern, "Attack on America Two Years Later," The San Diego Union-Tribune, September 11, 2003.)*

2503. In April 1998, when Bassnan's wife reportedly required thyroid surgery, Bassnan solicited the Saudi Embassy for help on his wife's behalf. At that time, Saudi Ambassador Prince Bandar bin Sultan wrote San Diego resident Osama Bassnan a $15,000 check from a Saudi Embassy account at Riggs Bank which was reportedly supposed to be used for medical treatment for Bassnan's wife. When Bassnan's wife made a separate request to the ambassador's wife, Princess Haifa al-Faisal, the ambassador's check became the first payment of regular monthly installments of between $2,000 to $3,000 to Majeda's bank account. The later payments came from Princess

Haifa, in the form of cashier's checks, also from Riggs Bank, which payments continued until the summer of 2002 and totaled approximately $130,000. *(See Graham, at 168; Richard A. Serrano, Doyle McManus, and Greg Krikorian, "Saudis Call Any Aid to Terrorists Unwitting," Los Angeles Times, November 24, 2002.)*

2504. The FBI later discovered, in 2002, that beginning in 2000, Bassnan's wife began signing her checks over to a woman named Manal Bajadr, al-Bayoumi's wife. The money is then believed to have been forwarded on to the September 11th hijackers by al-Bayoumi who is known to have logistically and financially supported the hijackers. This conclusion supports Bassnan's boast to the FBI that he had done more for the two terrorist hijackers than al-Bayoumi. *(See Graham, at 68; Michael Isikoff and Evan Thomas, "The Saudi Money Trail," Newsweek, December 2, 2002.)*

2505. Tracing the moneys that came from the Saudi Embassy to Bassan's wife, draws a line straight through the Embassy's Riggs Bank accounts with no questions ever raised, even though the transactions involved an unexplained stream of income flowing regularly from the Kingdom of Saudi Arabia, to the wife of one suspected spy, to the wife of a second suspected spy, and ultimately into the hands of two terrorist hijackers who planned and participated in a plot that resulted in crashing four airplanes and killing and injuring thousands of people, including the plaintiffs and/or their decedents.

2506. In early 2004, a federal investigation into the bank accounts of the Saudi Embassy in Washington identified "more than $27 million in suspicious transactions." The investigation looked into approximately $50 million in withdrawals and more than 100 separate Saudi accounts at Riggs Bank. According to Newsweek, the transactions included "hundreds of thousands of dollars paid to Muslim charities, clerics and Saudi students who are being scrutinized for possible links to terrorist activity." *(See Michael Isikoff, "Exclusive: New Questions About Saudi Money—And Bandar," Newsweek, April*

12, 2004; "Interview: Prince Bandar bin Sultan, Saudi ambassador to the US," NBC News: Meet the Press, April 25, 2004; Terence O'Hara and Kathleen Day, "Saudi Money at Riggs Probed; Equatorial Guinea's Accounts Also Investigated," The Washington Post, April 8, 2004.)

2507. According to the Washington Post, the investigation also uncovered at least $36 million in withdrawals from Saudi Embassy accounts that were not reported to bank regulators--$19 million in 2001 and $17 million in 2002. (See Kathleen Day and Terence O'Hara, "Riggs May be Fined Over Bank Secrecy Act," The Washington Post, April 2, 2004.)

2508. Riggs filed approximately 30 Suspicious Activity Reports (SAR) in 2003, after the bank was notified that it was under investigation by the Department of Treasury for non-compliance with anti-money laundering regulations. The reports illustrate that tens of millions of dollars was being distributed by Saudi officials via their Riggs' Embassy accounts to individuals and organizations with ties to al Qaeda and international terrorism. (See Kathleen Day and Terence O'Hara, "U.S. Ready to Fine Riggs Bank; Saudi Embassy Money Reports Scrutinized," The Washington Post, April 18, 2004.)

2509. If Riggs had reported these and other unusual or suspicious transactions in a timely manner, the United States authorities would have been alerted to the presence of the terrorist support to intercede and prevent the terrorist hijackers from proceeding with their deadly plot.

2510. Additionally, Riggs' provision of its financial services in the manner in which it did permitted the terrorist network to proceed, undetected, with, among other elements of its plan, flight training activities, which were a key element of the September 11, 2001 terrorist attacks.

2511.  Riggs' knowing, reckless or grossly negligent failure to have, implement, maintain, and/or enforce an appropriate money-laundering program is equivalent to "knowing participation" in the criminal and terrorist acts, including the September 11 terrorist attacks, that relied on Riggs' financial services and were funded and not detected because of the absence of an AML program.

## CLAIMS FOR RELIEF

## COUNT ONE

### (Federal Claim Under the ATSSSA)

2512.  Plaintiffs incorporate herein by reference all prior allegations.

2513.  All plaintiffs bring this action pursuant to ATSSSA § 408(b)(1) to recover for the deaths and injuries proximately caused by the defendants' negligent, reckless and/or  knowing wrongful conduct.  Pursuant to § 408(b)(2), the substantive law governing these claims is derived from, and incorporates, state law, except where preempted by federal law.

2514.  On September 11, 2001, defendants were financial institutions that had duties imposed upon them, in addition to the common law, by the AML statutes, regulations and industry standards set forth in previous paragraphs of this complaint, which AML statutes, regulations and industry standards were intended to alert the United States authorities to suspicious activities and prevent, inter alia, terrorist attacks such as the attacks that occurred on September 11, 2001.

2515.  Had defendants adhered to the applicable AML statutes, regulations and industry standards, defendants would have:

(A)  Established an adequate AML program that included explicit written policies and procedures which were approved by the bank's directors with notation of such approval in the minutes of the directors' meetings;

401

(B) Designated an adequate and qualified bank employee as the BSA compliance officer who would have properly performed day-to-day responsibilities for coordinating, monitoring, and all other aspects of the compliance program;

(C) Properly trained its employees as to the requirements of an adequate AML program pursuant to the BSA;

(D) Established an adequate internal audit function which allowed for independent testing for compliance to be conducted by bank personnel or by an outside party;

(E) Adequately performed and fulfilled "Know Your Customer" requirements;

(F) Properly monitored and exercised appropriate due diligence with regard to accounts, including high-risk accounts, including accounts for foreign financial institutions and/or accounts for wealthy foreign political figures;

(G) Refused suspicious or unusual transactions and/or closed accounts used for suspicious or unusual activities, and

(H) Properly filed the required reports to alert proper authorities to suspicious activities related to the financial support of at least two terrorist hijackers.

2516.   The plaintiffs and/or their decedents were individuals who were injured and/or killed because neither the terrorist hijackers nor their plans were discovered and they were able to succeed in their deadly plans.

2517.   Defendants breached their duty of care by engaging in reckless, negligent, grossly negligent, willful and wanton misconduct by not adhering to the AML statutes, regulations and industry standards, and by:

(A)   Failing to establish an adequate AML program that included explicit written policies and procedures which were approved by the bank's directors with notation of such approval in the minutes of the directors' meetings;

(B)   Failing to designate an adequate and qualified bank employee as the BSA compliance officer to properly performed day-to-day responsibilities for coordinating, monitoring, and all other aspects of the compliance program;

(C)   Failing to properly train employees as to the requirements of an adequate AML program pursuant to the BSA;

(D)   Failing to establish an adequate internal audit function which allowed for independent testing for compliance to be conducted by bank personnel or by an outside party;

(E)   Failing to adequately perform or fulfill "Know Your Customer" requirements;

(F)   Failing to properly monitor or exercise appropriate due diligence with regard to accounts, including high risk accounts, including accounts for foreign financial institutions and/or accounts for wealthy foreign political figures;

(G)   Failing to refuse suspicious or unusual transactions and/or failing to close accounts used for suspicious activities, and

(H)   Failing to properly file the required reports to alert proper authorities to suspicious activities related to the financial support of at least two terrorist hijackers.

2518.  As a result of defendants' breach of the duty of care:

(A)   Defendants operated with an inadequate AML program;

(B)   Defendants operated without an adequate and qualified bank employee as the BSA compliance officer, and thus, day-to-day responsibilities for

403

coordinating, monitoring, and other aspects of any compliance program that may have existed were performed inadequately;

(C)   Defendants operated with employees that were inadequately trained as to the requirements of an adequate AML program pursuant to the BSA;

(D)   Defendants operated without an adequate internal audit function which did not adequately permit independent testing for compliance to be conducted by bank personnel or by an outside party;

(E)   Defendants did not adequately perform or fulfill "Know Your Customer" requirements;

(F)   Defendants did not properly monitor or exercise appropriate due diligence with regard to accounts, including high risk accounts, including accounts for foreign financial institutions and/or accounts for wealthy foreign political figures;

(G)   Defendants allowed suspicious or unusual transactions to be performed;

(H)   Defendants allowed accounts used for suspicious activities to remain open, and

(I)   Defendants did not file the required reports to alert the proper United States authorities to suspicious activities related to the financial support of at least two terrorist hijackers,

significantly contributing to the continued concealment, aid, support and facilitation of the terrorist hijackers and their terrorist plot, so that the hijackers were able to succeed in their deadly plans.

2519.   The plaintiffs and/or their decedents were injured or killed when the terrorist hijackers took control of the four United States passenger airplanes and crashed them.

2520. Plaintiffs have, as a result of the foregoing, each suffered, and will continue to suffer, extreme grief, sorrow, devastation, pain and suffering and mental and physical anguish; including in the case of the wrongful death actions, the loss of the plaintiffs' decedents' society, love and affection, support, consortium and companionship, and are entitled to damages as wrongful death beneficiaries.

2521. Plaintiffs representing decedents who were killed in the terrorist attacks on September 11, 2001, bring this action for the wrongful death of their decedents, proximately caused by the defendants' negligent, reckless and/or knowing wrongful conduct.

2522. Plaintiffs representing decedents who were killed in the terrorist attacks on September 11, 2001, are entitled to recover monetary damages from defendants for the wrongful death of their decedents. Plaintiffs are entitled to recover full damages incurred, as fair and just compensation for the injuries, resulting from the wrongful death. As a beneficiary under the applicable states' wrongful death statute (incorporated into this cause by ATSSSA § 408)(b)(2)), plaintiffs have standing to bring this claim.

2523. The injuries, trauma, damages, loss of life and wrongful death suffered by the plaintiffs' decedents were proximately caused by the defendants' negligent, reckless and/or knowing wrongful conduct.

2524. As a direct and proximate result of the wrongful death of the plaintiffs' decedents, the plaintiffs' decedents' heirs have suffered and will continue to suffer emotionally, having been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support. The plaintiffs and the family and heirs of their decedents, have suffered and will continue to suffer mental anguish, grief and loss, loss of companionship and care, and pain and suffering. Plaintiffs are entitled to all damages available under the law of wrongful death.

2525. As a result of defendants' negligent, outrageous, fraudulent, willful and wanton, grossly negligent and/or reckless or knowing misconduct, as described herein, plaintiffs representing decedents who were killed in the terrorist attacks on September 11, 2001, are entitled to recover survival damages, for the severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury and/or assault experienced and suffered by plaintiffs' decedents. Plaintiffs' decedents suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending death and physical and emotional trauma. Plaintiffs' decedents were mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to their personal physical injury and deaths.

2526. As a result of defendants' tortious conduct, plaintiffs' decedents suffered damages including pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life and life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to their estates, and other immeasurable items of damages to be shown at trial. Plaintiffs herein seek and are entitled to survival damages for the injury, pain and death their decedents' suffered.

2527. As a result of defendants' outrageous, fraudulent, willful and wanton, grossly negligent and/or reckless misconduct, plaintiffs are entitled to punitive/exemplary damages to the fullest extent necessary and appropriate to punish defendants, and to deter the defendants and others from similar conduct, given the conscious or deliberate nature of the conduct, the degree of reprehensibility, duration, and concealment thereof, the degree of its harmful impact on the plaintiffs and society, the existence and frequency of similar past conduct, the profitability of such conduct to the defendants and the

406

desirability of removing that profit, and of having the defendants also sustain a loss, and the financial position or condition of the defendants.

2528. Even when defendants were eventually caught in multiple egregious AML violations, defendants continued to ignore and deny they had been engaging in any wrongful conduct.

> A.    For example, in April 2004, Riggs released a media statement which ignored government investigations of wrongdoing and the bank's own duty and responsibility to remedy the institution's failure to monitor and report suspicious financial activities from Riggs bank accounts. Through a spokesman, the bank stated:    "Neither the investigative agencies, nor the regulatory agencies have ever informed Riggs that such accounts were used for illegal purposes." *(See "Analysis: Riggs Bank is accused of failing to alert authorities of possible suspicious activity in its banks," NPR: Morning Edition, April 29, 2004.)*

> B.    For example, Mark Hendrix, a Riggs Bank Spokesman, stated, "Riggs has never acted willfully in violation" of money-laundering laws and is working to address problems.    "Riggs is financially strong, with capital ratios in excess of regulatory minimums.    Riggs has no indication that we ever were or are a target of an FBI investigation." *(See Glenn R. Simpson, "Regulators Turn Up Heat on Bank over Saudi Cash," Wall Street Journal, April 1, 2004.)*

> C.    For example, in January 2004, Riggs stated:    "From the moment we learned of the OCC's findings, we have taken them very seriously, and we have been commended by government banking regulators for our responsiveness and cooperation." *(See Glenn Simpson, "Probe of Saudi Embassy Widens as Bank Activity is Scrutinized," The Wall Street Journal, January 14, 2004.)*

2529. Defendants' failure, or refusal, to comply with known AML requirements constituted reckless, grossly negligent, and willful and wanton conduct.

2530. As a result of the foregoing, plaintiffs have been damaged in an amount not less than the statutory amount of $75,000.

## COUNT TWO

### (Federal Claim Under the Anti-Terrorism Act)

2531.  Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

2532.  The Defendants herein aided and abetted acts of domestic and/or international terrorism and/or provided financial services and sponsorship that enabled, proximately caused and significantly contributed to violent acts that were dangerous to human life, were in violation of the criminal law of the United States, were intended to intimidate or coerce a civilian population, and were intended to influence policy of the United States government by intimidation or coercion, or were to affect the conduct of the United States government by mass assassinations.

2533.  This material support through financial services and activity transcends international boundaries in terms of the means by which they were accomplished.  18 U.S.C. 2331.

2534.  Nationals of the United States injured in his or her person, property or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States for such acts of material support by aiding and abetting and providing financial services and shall recover threefold the damages he or she sustains and the costs of suit, including attorneys fees. 18 U.S.C. 2333.

2535.  Defendants, jointly, severally and proximately caused the deaths and injuries described herein through and by reason of acts of material support for domestic and/or international terrorism, the aiding and abetting domestic and/or international terrorism, conspiring to commit further acts of domestic and/or international terror, sponsoring or harboring Islamic extremists engaging in criminal enterprise to promote

domestic and/or international terrorism through illegal schemes, and/or the material support and sponsorship of domestic and/or international terrorism.

2536.  Defendants aided, abetted, conspired, or otherwise engaged in or provided material support for the acts of domestic and/or international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to domestic and/or international terrorism.  This material support and/or aiding and abetting of acts of domestic and/or international terrorism allowed Osama bin Laden and al Qaeda to carry out the terrorist attacks on the United States on September 11, 2001, injuring and killing the plaintiffs and their decedents.

2537.  As a result of Defendants' acts in furtherance of domestic and/or international terrorism, including but not limited to financial services, sponsorship, logistical or any other material support, all Plaintiffs suffered damages as set forth herein.

2538.  Pursuant to 18 U.S.C. §2333, the estates, survivors and heirs of the decedents who are nationals of the United States are entitled to recover threefold the damages they have sustained and the cost of suit, including attorneys' fees.

**COUNT THREE**

**(Wrongful Death)**

2539.  Plaintiffs incorporate herein by reference all prior allegations.

2540.  Plaintiffs representing decedents who were killed in the terrorist attacks on September 11, 2001, bring this action for the wrongful death of their decedents, proximately caused by the defendants' negligent, reckless and/or knowing wrongful conduct.

2541.  Plaintiffs representing decedents who were killed in the terrorist attacks on September 11, 2001, are entitled to recover monetary damages from defendants for the wrongful death of their decedents.  Plaintiffs are entitled to recover full damages

409

incurred, as fair and just compensation for the injuries, resulting from the wrongful death. As a beneficiary under the applicable states' wrongful death statute, plaintiffs have standing to bring this claim.

2542.   The injuries, trauma, damages, loss of life and wrongful death suffered by the plaintiffs' decedents were proximately caused by the defendants' negligent, reckless and/or knowing wrongful conduct.

2543.   As a direct and proximate result of the wrongful death of the plaintiffs' decedents, the plaintiffs' decedents' heirs have suffered and will continue to suffer emotionally, having been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support.   The plaintiffs and the family and heirs of their decedents, have suffered and will continue to suffer mental anguish, grief and loss, loss of companionship and care, and pain and suffering. Plaintiffs are entitled to all damages available under the law of wrongful death.

## COUNT FOUR

### (Survival)

2544.   Plaintiffs incorporate herein by reference all prior allegations.

2545.   As a result of defendants' negligent, outrageous, fraudulent, willful and wanton, grossly negligent and/or reckless or knowing misconduct, as described herein, plaintiffs representing decedents who were killed in the terrorist attacks on September 11, 2001, bring this action for the survival damages, for the severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury and/or assault experienced and suffered by plaintiffs' decedents.   Plaintiffs' decedents suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending death and physical and emotional trauma.   Plaintiffs'

410

decedents were mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to their personal physical injury and deaths.

2546.  As a result of defendants' tortious conduct, plaintiffs' decedents suffered damages including pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life ad life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to their estates, and other immeasurable items of damages to be shown at trial.  Plaintiffs herein seek and are entitled to survival damages for the injury, pain and death their decedents' suffered.

## COUNT FIVE

### (Negligence)

2547.  Plaintiffs incorporate by reference all prior allegations contained in this Complaint.

2548.  On September 11, 2001, defendants were financial institutions that had duties imposed upon them, in addition to the common law, by the AML statutes, regulations and industry standards set forth in previous paragraphs of this complaint, which AML statutes, regulations and industry standards were intended to alert the proper United States authorities to suspicious activities and prevent, inter alia, terrorist attacks such as the attacks that occurred on September 11, 2001.

2549.  Had defendants adhered to the applicable AML statutes, regulations and industry standards, defendants would have:

(A)  Established an adequate AML program that included explicit written policies and procedures which were approved by the bank's directors with notation of such approval in the minutes of the directors' meetings;

411

(B) Designated an adequate and qualified bank employee as the BSA compliance officer who would have properly performed day-to-day responsibilities for coordinating, monitoring, and all other aspects of the compliance program;

(C) Properly trained its employees as to the requirements of an adequate AML program pursuant to the BSA;

(D) Established an adequate internal audit function which allowed for independent testing for compliance to be conducted by bank personnel or by an outside party;

(E) Adequately performed and fulfilled "Know Your Customer" requirements;

(F) Properly monitored and exercised appropriate due diligence with regard to accounts, including high-risk accounts, including accounts for foreign financial institutions and/or accounts for wealthy foreign political figures;

(G) Refused suspicious or unusual transactions and/or closed accounts used for suspicious or unusual activities, and

(H) Properly filed the required reports to alert proper authorities to suspicious activities related to the financial support of at least two terrorist hijackers.

2550. The plaintiffs and/or their decedents were individuals who were injured and/or killed because neither the terrorist hijackers nor their plans were discovered and they were able to succeed in their deadly plans.

2551. Defendants breached their duty of care by engaging in reckless, negligent, grossly negligent, willful and wanton misconduct by not adhering to the AML statutes, regulations and industry standards, and by:

(A)   Failing to establish an adequate AML program that included explicit written policies and procedures which were approved by the bank's directors with notation of such approval in the minutes of the directors' meetings;

(B)   Failing to designate an adequate and qualified bank employee as the BSA compliance officer to properly performed day-to-day responsibilities for coordinating, monitoring, and all other aspects of the compliance program;

(C)   Failing to properly train employees as to the requirements of an adequate AML program pursuant to the BSA;

(D)   Failing to establish an adequate internal audit function which allowed for independent testing for compliance to be conducted by bank personnel or by an outside party;

(E)   Failing to adequately perform or fulfill "Know Your Customer" requirements;

(F)   Failing to properly monitor or exercise appropriate due diligence with regard to accounts, including high risk accounts, including accounts for foreign financial institutions and/or accounts for wealthy foreign political figures;

(G)   Failing to refuse suspicious or unusual transactions and/or failing to close accounts used for suspicious activities, and

(H)   Failing to properly file the required reports to alert proper authorities to suspicious activities related to the financial support of at least two terrorist hijackers.

2552.   As a result of defendants' breach of the duty of care:

(A)   Defendants operated with an inadequate AML program;

(B)   Defendants operated without an adequate and qualified bank employee as the BSA compliance officer, and thus, day-to-day responsibilities for

413

coordinating, monitoring, and other aspects of any compliance program that may have existed were performed inadequately;

(C)   Defendants operated with employees that were inadequately trained as to the requirements of an adequate AML program pursuant to the BSA;

(D)   Defendants operated without an adequate internal audit function which did not adequately permit independent testing for compliance to be conducted by bank personnel or by an outside party;

(E)   Defendants did not adequately perform or fulfill "Know Your Customer" requirements;

(F)   Defendants did not properly monitor or exercise appropriate due diligence with regard to accounts, including high risk accounts, including accounts for foreign financial institutions and/or accounts for wealthy foreign political figures;

(G)   Defendants allowed suspicious or unusual transactions to be performed;

(H)   Defendants allowed accounts used for suspicious activities to remain open, and

(I)   Defendants did not file the required reports to alert the proper United States authorities to suspicious activities related to the financial support of at least two terrorist hijackers,

2553.  significantly contributing to the continued concealment, aid, support and facilitation of the terrorist hijackers and their terrorist plot, so that the hijackers were able to succeed in their deadly plans.

2554.  The plaintiffs and/or their decedents were injured or killed when the terrorist hijackers took control of the four United States passenger airplanes and crashed them.

2555. Plaintiffs have, as a result of the foregoing, each suffered, and will continue to suffer, extreme grief, sorrow, devastation, pain and suffering and mental and physical anguish; including in the case of the wrongful death actions, the loss of the plaintiffs' decedents society, love and affection, support, consortium and companionship, and are entitled to damages as wrongful death beneficiaries.

2556. As a result of the foregoing, plaintiffs have been damaged in an amount not less than the statutory amount of $75,000.

## COUNT SIX

### (Punitive Damages)

2557. Plaintiffs incorporate by reference all prior allegations.

2558. As a result of defendants' outrageous, fraudulent, willful and wanton, grossly negligent and/or reckless misconduct, plaintiffs are entitled to punitive/exemplary damages to the fullest extent necessary and appropriate to punish defendants, and to deter the defendants and others from similar conduct, given the conscious or deliberate nature of the conduct, the degree of reprehensibility, duration, and concealment thereof, the degree of its harmful impact on the plaintiffs and society, the existence and frequency of similar past conduct, the profitability of such conduct to the defendants and the desirability of removing that profit, and of having the defendants also sustain a loss, and the financial position or condition of the defendants.

2559. Even when defendants were eventually caught in multiple egregious AML violations, defendants continued to ignore and deny they had been engaging in any wrongful conduct.

> A.    For example, in April 2004, Riggs released a media statement which ignored government investigations of wrongdoing and the bank's own duty and responsibility to remedy the institution's failure to monitor and report suspicious financial activities from Riggs bank accounts. Through a spokesman, the bank stated:   "Neither the investigative

agencies, nor the regulatory agencies have ever informed Riggs that such accounts were used for illegal purposes." *(See "Analysis: Riggs Bank is accused of failing to alert authorities of possible suspicious activity in its banks," NPR: Morning Edition, April 29, 2004.)*

B.      For example, Mark Hendrix, a Riggs Bank Spokesman, stated, "Riggs has never acted willfully in violation" of money-laundering laws and is working to address problems. "Riggs is financially strong, with capital ratios in excess of regulatory minimums. Riggs has no indication that we ever were or are a target of an FBI investigation." *(See Glenn R. Simpson, "Regulators Turn Up Heat on Bank over Saudi Cash," Wall Street Journal, April 1, 2004.)*

C.      For example, in January 2004, Riggs stated: "From the moment we learned of the OCC's findings, we have taken them very seriously, and we have been commended by government banking regulators for our responsiveness and cooperation." *(See Glenn Simpson, "Probe of Saudi Embassy Widens as Bank Activity is Scrutinized," The Wall Street Journal, January 14, 2004.)*

2560.  Defendants' failure, or refusal, to comply with known AML requirements constituted reckless, grossly negligent, and willful and wanton conduct.

## COUNT SEVEN

## AIDING AND ABETTING

2561.  Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

2562.  At the time of such aiding and abetting, Defendants knew or should have known that their role in providing financial services was part of an overall and ongoing illegal, criminal and/or tortious activity.

2563.  Defendants knowingly and/or recklessly aided, abetted or otherwise assisted in the material support of the actions of Osama bin Laden, al Qaeda, militant Islamic extremism, and/or domestic and/or international terrorism that led to the September 11, 2001 terrorist attacks that killed and injured the Plaintiffs herein and/or their decedents.

2564. As set forth above, the Defendants aided and abetted through financial activities, efforts, transactions, acts and conduct that proximately caused and significantly contributed to the attacks of September 11, 2001, on the United States, its citizens, foreign citizens, its liberties and freedoms.

2565. Defendants' aiding and abetting of international terrorism through providing material support or sponsorship was a proximate cause of the September 11, 2001 terrorist attacks that killed and injured the Plaintiffs.

2566. As a direct and proximate result of the Defendants' aiding and abetting activities, Plaintiffs have suffered damages as set forth herein.

## COUNT EIGHT

### (Assisting In the Intentional Injury of Others by a Third Party)

2567. Plaintiffs incorporate herein by reference all prior allegations.

2568. Defendants knew, or should have known, that funds transferred through defendants' bank facilities, as discussed herein throughout, and that defendants failure to prevent and/or report the suspicious account activity and currency transactions to the proper United States authorities pursuant to their applicable duties, were being used to support, encourage, entice and make possible tortious, terrorist and/or otherwise illegal conduct, including conduct such as that of the terrorist hijackers that injured and killed the plaintiffs and their decedents on September 11, 2001.

2569. Through both their actions and their inactions, defendants allowed defendants' bank facilities to be used by the terrorists and their supporters to support, encourage, entice and make possible the intentional and foreseeable acts of those terrorists and their supporters including, but not limited to, the terrorist acts that injured and killed the plaintiffs and their decedents on September 11, 2001.

2570.  Defendants' actions and inactions served to create an unreasonable risk of harm to others including but not limited to the plaintiffs and their decedents, through the foreseeable acts of the terrorists hijackers and their supporters.

2571.  At the time of their conduct, defendants realized or should have realized the likelihood that the accounts were being used in such a way and that the terrorist hijackers, as well as their supporters, might avail themselves of the opportunity to commit such torts or crimes.

2572.  As a result of the foregoing, plaintiffs have been damaged in an amount not less than the statutory amount of $75,000.

## COUNT NINE

### (Reckless Disregard)

2573.  Plaintiffs incorporate herein by reference all prior allegations.

2574.  Defendants knew, or should have known, that funds transferred through defendants' bank facilities, as discussed herein throughout, and that defendants failure to prevent and/or report the suspicious account activity and currency transactions to the proper United States authorities pursuant to their applicable duties were being used to support, encourage, entice and make possible tortious, terrorist and/or otherwise illegal conduct, including conduct such as that of the terrorist hijackers that injured and killed the plaintiffs and their decedents on September 11, 2001.

2575.  As a result, defendants were aware, or should have been aware, of a risk so great that it was highly probable that serious harm and/or death could result from their action and/or inaction which allowed the account activity as described herein without application of and adherence to proper AML laws, regulations, standards, policies and procedures.

418

2576. Defendants recklessly disregarded this known, knowable and substantial risk thereby concealing, facilitating, enabling, and otherwise making possible foreseeable tortious, terrorist and otherwise unlawful conduct, including the terrorist plans of the September 11, 2001 terrorist hijackers and their supporters, which plans culminated in the injury and death of the plaintiffs and their decedents on September 11, 2001. Defendants' reckless disregard was a direct and proximate cause of and a substantial factor in bringing about the injury and/or death of plaintiffs and/or their decedents.

2577. As a result of the foregoing, plaintiffs have been damaged in an amount not less than the statutory amount of $75,000.

## COUNT TEN

### (Negligent and/or Intentional Infliction of Emotional Distress)

2578. Plaintiffs incorporate herein by reference all prior allegations.

2579. Defendants knowingly, recklessly, intentionally and directly aided and abetted, intentionally facilitated, and/or recklessly disregarded its duties pursuant to AML laws, regulations, standards, practices and policies, where they knew or should have known that such conduct would conceal, facilitate, enable, and otherwise make possible foreseeable tortious, terrorist and otherwise unlawful conduct, including the terrorist plans of the September 11, 2001 terrorist hijackers and their supporters, which plans culminated in the injury and death of the plaintiffs and their decedents on September 11, 2001.

2580. Defendants intended or knew or should have known, that their failure to perform their duties pursuant to AML laws, regulations, standards, practices and policies, where they knew or should have known that such conduct would conceal, facilitate, enable, and otherwise make possible foreseeable tortious, terrorist and otherwise unlawful conduct, including the terrorist plans of the September 11, 2001 terrorist

419

hijackers and their supporters would lead to the killing of or injury to innocent persons who were the victims of the foreseeable tortious, terrorist and otherwise unlawful conduct, as well as resulting severe emotional distress.

2581.  Defendants intended, knew, or should have known that the foreseeable tortious, terrorist and otherwise unlawful conduct of those using the accounts referenced herein, including the terrorist plans of the September 11, 2001 terrorist hijackers and their supporters, would kill, maim, and/or permanently injure innocent people, leaving devastated family members to grieve for their losses with ongoing physical, psychological and emotional injuries and ongoing post traumatic stress disorder.

2582.  The actions of defendants were unconscionable and done with an intentional, malicious, wilful, and/or reckless disregard for the rights and lives of those murdered, those injured, and the surviving family members.

2583.  As a direct and proximate cause of defendants' intentional misconduct and/or reckless disregard for human life, plaintiffs have suffered and will continue to suffer severe, debilitating, permanent emotional, physical and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counselling and long-term care, particularly for all minor plaintiffs.

2584.  Defendants, by engaging in this intentional, unlawful conduct, intentionally, grossly negligently, or negligently inflicted emotional distress upon the plaintiffs.

2585.  As a result of the foregoing, plaintiffs have been damaged in an amount not less than the statutory amount of $75,000.

## TOLLING OF APPLICABLE STATUTES OF LIMITATION

2586. Any applicable statutes of limitations have been tolled by defendants' knowing and active concealment and denial of the facts as alleged herein. Plaintiffs have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiffs could not reasonably have discovered the wrongful conduct of the defendants.

2587. Defendants are and were under a continuing duty to disclose the true character, quality and nature of their conduct to the plaintiffs and other members of the greater public. Because of their knowing, affirmative, and/or active concealment of the true character, quality, and nature of its conduct, defendants are estopped from relying upon any statute of limitations.

## JURY DEMAND

2588. Plaintiffs demand a trial by jury of all issues that are so triable.

## REQUEST FOR RELIEF

WHEREFORE, having complained of the conduct of the defendants, plaintiffs pray that the Court enter judgment against defendants and in favor of the plaintiffs, and demand entry of judgment against the defendants for:

A.)  Actual and compensatory damages sufficient to compensate fully for all losses suffered by the plaintiffs in an amount to be determined by a jury, not less than the statutory amount of $75,000;

B.)  Punitive and/or exemplary damages in an amount adequate to punish defendants for defendants' unlawful conduct and to deter defendants and other financial institutions from similar conduct in the future;

C.)  Treble damages;

D.)  Prejudgment interest;

E.)  All costs of this proceeding including reasonable attorneys fees;

F.)    Such other relief as may be just and appropriate.

MOTLEY RICE LLC

By:    _____
       Ronald L. Motley, Esquire (SC Bar No. 4123)
       Jodi Westbrook Flowers, Esquire (SC Bar No.
         66300)
       Donald Migliori, Esquire (RI Bar No. 4936;
         MA Bar No. 567562; MN Bar No. 0245951)
       Robert T. Haefele, Esquire (NJ Bar No.
         58293; Pa Bar No. 57937)
       Michael E. Elsner, Esquire (ME-8337)
       Justin B. Kaplan, Esquire (TN Bar No.
         022145)
       28 Bridgeside Boulevard
       Mount Pleasant, SC 29465
       Telephone:  (843) 216-9000


                    and


**HANLY CONROY BIERSTEIN**
**& SHERIDAN LLP**

By:    _____
       Jayne Conroy, Esquire (JC-8611)
       Paul J. Hanly, Jr., Esquire (PH-5486)
       Andrea Bierstein, Esquire (AB-4618)
       415 Madison Avenue
       New York, NY 10017-1111
       Telephone: (212) 401-7600

March 23, 2005

422