UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK    ___

APRIL GALLOP, for Herself and as Mother
and Next Friend of ELISHA GALLOP, a Minor,       **No. 08-CV-10881**

                        Plaintiff,          **PLAINTIFFS' MEMORANDUM
                                            IN OPPOSITION TO DEFENDANTS'
                                            MOTION TO DISMISS**

        vs.

DICK CHENEY, Vice President of the U.S.A.,
DONALD RUMSFELD, former U.S. Secretary
of Defense, General RICHARD MYERS, U.S.A.F.
(Ret.), and John Does Nos. 1– X, all in their
individual capacities,

                        Defendants.
_____


**PLAINTIFFS' MEMORANDUM
IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**


                              Dennis Cunningham  (DC 7142)
                              36 Plaza Street
                              Brooklyn, NY 10211
                              718-783-3682
                              denniscunninghamlaw@gmail.com

                              William W. Veale
                              2033 North Main Street, #1060
                              Walnut Creek, CA 94596
                              925-935-3987
                              centerfor911justice@gmail.com

                              Mustapha Ndanusa
                              26 Court Street, #603
                              Brooklyn, NY 11201
                              718-825-7719
                              mndanusa@gmail.com

                              **ATTORNEYS FOR PLAINTIFFS**

# TABLE OF CONTENTS

Page

Table of Cases ........................................................... ii

**PRELIMINARY STATEMENT** ........................... 1

ARGUMENT .............................................................. 4

I.  THE FACTS TO PROVE DEFENDANTS'
    INVOLVEMENT ARE THERE. ...................... 4

II.  THE PLAINTIFF'S CLAIMS ARE VALID
     AND COGNIZABLE ...................................... 10

A.    There was a clear-cut constitutional right
      which was violated. .................................... 11

B.    There was a Conspiracy .............................. 13

C.    Defendants are not entitled to Qualified Immunity ... 15

III.    THERE IS NO ESTOPPEL, AND NO TIME-BAR ... 16

A.    The Estoppel Claim is Unfounded ............. 16

**B.    The Statute of Limitations Claim is problematic,
       but Cannot Fairly be Resolved Against Ms. Gallop at
       his Stage; and Need Not Be, because the Case will
       ontinue on the Same Terms, Regardless...** ......... **18**

C.  Defendants' Other Claims ............................ 20

III.    THE COMPLAINT IS NOT FRIVOLOUS;
        ANYTHING BUT... ..................................... 21

CONCLUSION .......................................................... 22

PRAYER FOR RELIEF ............................................ 24

i

# TABLE OF CASES

*Adickes v Kress*, 398 U.S. 144 (1970)……………………………………………………...14

*Ashcroft v Iqbal*,  ___ U.S. ___, 2009 WL 1361536, ........................................................ 5

*Bank of Columbia v. Okely,* 17 U.S. 235, 4 Wheat. 235-244, 4 L.Ed. 559 (1819) .......... 12

*Bates v. LIRR Co.*, 997 F.2d 1028 (2nd Cir.1993) ............................................................. 17

*Behrens v. Pelletier*, 516 U.S. 299, 310 (1996) ................................................................. 17

*Bell Atlantic Corp. v. Twombly*, 554 U.S. 550 (2007) ........................................................ 5

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) ........................................... 12

*Chuman v. Wright*, 960 F.2d 104, 105 (9th Cir. 1992) ...................................................... 17

*Collins v. Harker Heights*, 503 U.S. 115, at 129, 112 S.Ct., at 1071 (1992) .................... 12

*Conley v. Gibson* ................................................................................................................. 5

*County of Sacramento v Lewis,* 523 U.S. 833, 840 (1988): .............................................. 12

*County of Sacramento v Lewis*, 523 U.S. at  847 .............................................................. 13

*County of Sacramento v Lewis*, 533 U.S. .......................................................................... 12

*Davidson v. Cannon*, 474 U.S., at 348, 106 S.Ct, at 670-671 ........................................... 12

*Dennis v. Sparks*, 449 U.S. 24 (1980). ............................................................................... 21

*Dent v. West Virginia*, 129 U.S. 114, 123, (1889)") ........................................................... 12

*DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S., at 196, 109 S.Ct., ..... 12

*Eastern States Retail Lumber Dealers Assn. v. United States*, 234 U.S. 600, 612 (1913) 14

*Fitzgerald v. Seamans*, 553 F.2d 220, 229 (D.C.Cir. 1977) ............................................. 20

*Frazier v. SEPTA*, 785 F.2d 65, 67 (3rd Cir. 1986) .......................................................... 15

*Gilbert v. Bagley*, 492 F. Supp. 714, 727 (M.D.N.C. 1980) ............................................. 15

*Graham v Connor*, 490 U.S. 386 (1989), ........................................................................ 11

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ................................................................ 21

*Hafner v. Brown*, 923 F.2d 570 (4th Cir. 1992) .............................................................. 15

*Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); ........................................... 15

*Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979) ........................................ 15

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ..................................................................... 16

*Hobson v. Wilson*, 737 F.2d 1 (D.C.Cir. 1984), *cert. denied* 470 U.S. 1084 (1985) ........ 20

*Hurtado v. California*, 110 U.S. 516, 527, 4 S.Ct., at 117 (1884). ................................... 12

*Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied*, 414 U.S. 1033 (1973). .. 14

*Malley v. Briggs*, 475 U.S. 335, 341 (1986) ................................................................... 16

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001): ..................................................... 18

*Roe v. Wade*, 410 U.S. 953 (1973), ................................................................................ 21

*Sacramento County v. Lewis*, 523 U.S. 833 (1998), ................................................... 11, 16

*Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir.1997 .......................................... 18

*State of Colo., etc. v. Western Paving Const. Co.* 833 F.2d 867, 871 (10th Cir.1987 ....... 20

*State of Tex. v. Allan Const. Co., Inc.* 851 F.2d 1526, 5th Cir. 1988; ............................... 20

*Bell Atlantic Corp. v.Twombly*, 554 U.S. 550  (2007) ....................................................... 5

*Uzdavines v. Weeks Marine Inc.*, 418 F.3d 138 (2nd Cir. 2005), .................................... 17

*Wilson v. Garcia*, 471 U.S. 261 (1985), ......................................................................... 19

*Wilson v. Northcutt*, 987 F.2d 719 (11th Cir. 1993) ....................................................... 11

*Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) .............................................................. 12

iii

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK _____

APRIL GALLOP, for Herself and as Mother
and Next Friend of ELISHA GALLOP, a Minor,                    **No. 08-CV-10881**

                         Plaintiff,          **PLAINTIFFS' MEMORANDUM
IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS**

        vs.

DICK CHENEY, Vice President of the U.S.A.,
DONALD RUMSFELD, former U.S. Secretary
of Defense, General RICHARD MYERS, U.S.A.F.
(Ret.), and John Does Nos. 1– X, all in their
individual capacities,

                    Defendants.
_____

## MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

### PRELIMINARY STATEMENT

It is difficult find the right note to strike, in arguing to this honorable Court about claims so inherently shocking, and inevitably so outrageous and repellent to many people, as those the undersigned have found themselves constrained to bring on behalf of the plaintiff and her child in this case.  Obviously, the very idea that such high officials and their cohorts could bring themselves to, and did, engage in the actions necessary to passively permit, facilitate and/or enable the horrific attack to take place as it did—let alone actively participate, in the way so much of the evidence so strongly shows—is extremely repugnant.  Truly, it must confound, and undoubtedly offend, the liberal conscience to which it is addressed.

The Court can be assured the undersigned are familiar with this feeling, first from having experienced it ourselves at the outset of the inquiry.  The Court's Rule 11 question at the motion conference likewise implicates it, unavoidably; and there's no blame, since

1

the very idea that it was a 'false flag' operation, an inside job, is so rudely striking. Blame could come only to a refusal to consider the evidence, and there discover the breadth and blatancy of the cover-up—which has so well obscured and discredited the very idea—as well as much shocking truth about these events.

Unavoidably also, it is in this atmosphere of incredulity, skepticism, and incipient outrage, that we encounter the question of What Must Be Taken As True, for purposes of this motion, and this litigation, and on what terms—particularly in light of a new Supreme Court opinion on this very subject.

Foundationally, plaintiffs hold it is established that nineteen Arab men, several of them known terrorist suspects, and some of whom had taken flying lessons, were able to enter and move about the country, book passage in groups of four or five under their own names, and then board these planes, with weapons. This happened despite dozens of solid warnings of an imminent terrorist strike, which were studiously ignored, and clear prior recognition by counter-terrorist authorities and trainers that airliners might be hijacked and suicidally flown into tall buildings, including the Trade Center towers. Defendant Cheney had been placed in over-all charge of U.S. counter-terrorism plans and operations by the president in May, 2001.

And the official explanation, for which defendants are ultimately responsible, is that there was simply an endless series of unfortunate lapses, and miscommunications, etc, and no one is to blame—and no one has been blamed. The official Report of the 9/11 Commission—which it has now been shown was written in outline before the inquiry even began, by Bush Administration operative Philip Zelikow, the Commission staff director—is loaded with omissions, distortions and outright lies; a whitewash of epic proportions.

And none of the three named defendants, the highest-ranking officers involved—whose other known acts and omissions supporting the inferences of complicity, and conspiracy, are specified further below—has ever mounted any inquiry or taken any steps

2

to investigate the huge morass of failure in the air defense system, and the Pentagon defense system, to determine how it came about, or if any dereliction of duty was involved.  Instead, they resisted formation of the Commission that was convened to investigate, stacked it with partisans and patsies, played "hardball" about the powers it would have and rules it would observe, and received an official report which misrepresented events and whitewashed the failures of those responsible.  Plaintiffs count this as a primary matter of (established) fact, of the greatest significance in linking defendants to the attacks of that day...

        \*\*        \*\*        \*\*        \*\*

The Government's response to plaintiffs' charges is, essentially, that such extreme claims and accusations simply must not be countenanced.  They demand dismissal, asking the Court to find that we fail to state a cognizable claim, and that whatever claim we do state should be adjudged frivolous in any case.  They say also that Ms Gallop's claim is time-barred, and they seek to raise an estoppel, with respect to the assertion in her Complaint that no airliner hit the Pentagon, based on a supposedly contrary statement in an earlier case she was involved in.  Querulously, they also assert qualified immunity—speaking of frivolous claims—meaning they demand judgment, as a matter of law, that reasonable men in their position, carrying out the plot the plaintiffs have pled and described, would not have known their actions would violate anyone's rights...

As we will show, besides defendants' demand-slash-prayer that the Court join the cover-up, there are no substantial grounds for dismissal at this early point.  Instead, to go forward judiciously, plaintiffs encourage the Court to phase and condition development of the evidence in any reasonable way—on whatever long road must be traversed between now and summary judgment, or trial—so as to maintain its own working orientation towards the ghastly, forbidding issues to be explored, and the still-accumulating hard evidence that informs them.

3

## ARGUMENT

## I. THE FACTS TO PROVE DEFENDANTS' INVOLVEMENT ARE THERE.

The Supreme Court has just issued an opinion on the question of the sufficiency of factual support for hard-to-accept claims against high officials, in *Ashcroft v Iqbal*, ___ U.S. ___, 2009 WL 1361536, May 18, 2009.  There, a fairly grave accusation was brought against very high officials of the U.S.Government by a man who was imprisoned in the U.S. Immigration Department sweep of Arab nationals present in this country after 9/11.  He said he was assaulted and mistreated while in custody, and wrongfully held for months, and alleged the Attorney General and the head of the FBI had caused this as part of an effort and with intent to discriminate against Arabs.  The issue before the Court was whether the minimalistic Rule 8, as interpreted by the Court in *Conley v. Gibson* and successive cases, requires that the defendants—especially those of such high rank—be held to answer on the plaintiff's unsupported, 'conclusory', allegation of unlawful intent.

The Court said No; bare allegations of wrongdoing will not suffice, regardless of the "notice pleading" principle adopted in *Conley*.  Some factual foundation must be supplied for what are otherwise implausible—or un-provable—'conclusory' claims. Carefully reviewing its recent, extensive analysis in *Bell Atlantic Corp. v. Twombly*, 554 U.S. 550 (2007), the Court observes that the Rule 8 "pleading standard... demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" 2009 WL 1361536, at headnotes [10][11] (Internal cites omitted; see *Twombly*, 550 U.S. 555-57).  Drawing further on the *Twombly* discourse, the Court said,

> To survive a motion to dismiss, a complaint must contain
> sufficient factual matter, accepted as true, to "state a claim to relief
> that is plausible on its face." A claim has facial plausibility when the

> plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Id. at headnotes [12][13]; and went on,

> "To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical..." or because they are "too chimerical to be maintained. *It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.*"

2009 WL 1361536, headnote [14] (Internal cites omitted, emphasis added). See *Bell v Twombly,* 550 U.S. 550-57.

The plaintiffs here have met and exceeded this standard. An extensive, possibly excessive, factual basis for the plaintiff's charges is given—however uncomplimentary defendants are in describing it—to the point where the problem in drafting was what to leave out. So, where the Supreme Court found in *Iqbal* a complete lack of articulable facts to support the plaintiff's allegation that the defendant high officials meant to cause him harm, concrete factual allegations abound in the instant case, including those which implicate these defendants individually, and show their malign and deliberately indifferent state of mind, well within the rule of *Iqbal*, and which show further that they conspired. And these are to be taken as true from here on, as long as we can support them; and the legitimate inferences must also be accepted.

The challenged 'conclusory' allegation here, presumably, would be, roughly, that these command defendants, with as-yet-undetermined others, conspired to, and, by some combination of acts and omissions in concert with others did, allow and in a substantial way enable, the 9/11 attacks to take place, by the boarding and crashing of four airliners and other apparent means. Further factual matters, which can be proved, and inferences, discussed below, which plaintiffs proffer and rely on to show the defendants' "personal

involvement" in some actionable degree of conscious complicity with the attackers, and which support the conspiracy allegation, are, as mentioned, dramatically narrated in the attached Affidavit of Professor David Lee Griffin.  Those most pertinent to the matters raised by this Motion can be summarized as follows:

    +  Defendant Cheney was the top government official present in Washington at the time of the attacks, the president himself being on a 'photo-op' junket to a 2nd grade classroom in Florida; and defendants Rumsfeld and Myers were the top commanders of the military, and particularly the U.S. Air Force; and of the Pentagon and its defenses. They had the highest-level duties of command, and of responsibility for the safety, welfare and protection of their subordinates, including plaintiffs.

    +  The Air Force was alerted to the wayward planes in plenty of time to intercept all of them under normal procedures, as shown in published FAA records and elsewhere; but—despite a regular, weekly practice of launching fighter jets to check in-flight airline emergencies—the interceptors never showed up.

    +  FAA Flight controllers put out alerts that Flight 77 was off course as much as 30-40 minutes before it supposedly crashed into the Pentagon, and defendant Cheney just now, in May 2009, publicly affirmed that, stationed in the presidential command bunker below the White House, he knew well in advance that it was headed back towards Washington, where it supposedly crashed at 9:38 (or possibly 9:32).  The White House was evacuated, but no warning was given at the Pentagon, and no evacuation took place. Instead this powerfully defended building was hit, or blew up, or both, and plaintiffs were injured, and no official question has been raised as to why they were not warned.

    +  Cheney, in the bunker around that same time, well before the Pentagon was hit, gave or re-affirmed some form of stand-down order, about which then-Transportation Secretary Norman Mineta testified before the 9/11 Commission; but the Commission, in furtherance of the cover-up, ignored his evidence.  Instead, the Commission Report maintains that Cheney did not even reach the bunker until just before 10:00.  Just last

month (May, 2009), however, in a public speech before the American Enterprise
Institute, Cheney confirmed that he was in fact already in the bunker when word came
that an unknown plane, possibly also hijacked (where Flight 77 was supposedly lost), was
headed towards Washington.  Although the exact time---as well as undoubted real-time
radar awareness---is disputed, the military concedes it had knowledge, and an active
"phone bridge" with FAA , well before 9:24 am., the "official" time notice about Flight
77 was supposedly given.  He said he was there when the word was given, certainly by
that time at least (though we would say he arrived earlier), and that he knew the third
plane had turned around and was headed back towards the capital, at or before the time
Secretary Mineta describes him giving an apparent stand-down order.  Certainly he gave
the lie to the Commission's preposterous claims that the military didn't know about
Flight 77 until it hit the Pentagon, and that Cheney never reached the bunker until 9:58
am.

Mr. Mineta, also in May of this year, affirmed to plaintiff's counsel, in person,
that while he prefers to let the legal process play out before discussing it, he stands by the
account he gave to the 9/11 Commission.  See Appendix 4, 2nd Veale Affidavit, p.6.

+    The then-chief of U.S. Counter-terrorism operations, Richard Clarke, in the
account in his book, "Against All Enemies", published shortly before the Commission
Report came out in 2004, said he convened a video 'teleconference' with the highest
circle of officials, specifically including Rumsfeld and Myers---whom he saw on the
screen at the conference center in the Pentagon---at or about ten minutes after nine; i.e, a
few minutes after the second tower was hit.  At that point there could be no doubt that the
country was under attack; so, this of course is what one would expect—and maybe expect
also that the defendants would be 'freaking out', so to speak, at the failure of the defense
system, the no-show of the interceptors, even then, even with the plane Cheney
mentioned headed back at them, 20 minutes before the Pentagon was hit *at least*.

But, nothing happened: the wires were not burned up, the hot pilots were not scrambled and vectored to the wayward plane headed towards Washington, D.C., and possibly flown by suicide bombers; and the Commanders apparently just sat around, or made themselves scarce; *and they have never been called to account,* for the lethal failure of the defenses under their command.[1]

According to the finding of the 9/11 Commission, defendants Rumsfeld and Myers both said they were occupied with other matters—Rumsfeld in a briefing in his office and Myers in a meeting on Capitol Hill—and were unaware of the attack as a whole (no "situational awareness", in the jargon) until the Pentagon was hit. Thus the Commission completely evaded, as did the defendants, any question of why they were not at their posts, defending the country; and they have never answered Clarke's account.

That is, at a minimum, there is solid evidence, including the Cheney admission, Clarke's account of the teleconference, and possibly a videotape, showing that all three defendants—effectively in command of the government and the military, in crisis in the wake of the two crashes in New York—were in possession of real-time information that another plane was out of contact, likely also hijacked and headed back towards Washington and the inviting targets there, and they failed to get fighters in the air, and did nothing to warn their own people in the Pentagon, and get them safely out. Why is it not legitimate to surmise that a fix was in?

Rumsfeld and Myers didn't even leave the building, or take shelter, despite the vulnerability of their position on the third floor in the outer ring, where the Secretary's and the Joint Chiefs' offices were publicly known to be located. Why is it not fair to allege, on these facts—that they knew they were safe, *and they were knowingly,*

---

[1]    Tapes of this and other video-conferences on the crisis that were held that morning have been suppressed—and were not demanded by the 9/11 Commission. As many as 85 tapes from video surveillance cameras at and around the Pentagon are apparently being withheld from FOI requests by the U.S. Department of Justice.

*deliberately, monumentally, indifferent to the mortal danger to their own people there  in the building*, including the plaintiffs?

Defendant Rumsfeld, just an hour or so before the attack, predicted it would happen, apparently for the second time; and later he spoke publicly of "the missile" that hit the Pentagon.  On the TV show "Good Morning America" on September 13, 2001, he said (falsely) that the nose of the plane had penetrated the building and broken through the inner, "C-ring" wall, and was sitting there.  But no photograph showing anything like this has ever been shown, and it is impossible in any case, as we can show.  Instead there are pictures of a large round empty hole, some 300 feet from the supposed point of impact, through a maze of pillars and walls inside this huge, fortified building; and there was no sign of a crashed airliner across the whole span.   Why is this not adequate to support our allegations of *scienter*, deliberate indifference which shocks the conscience, and concealment of the truth in furtherance of the conspiracy?

Defendants have pointed out our disclaimer of any bugging devices, a turncoat or "Deep Throat"-type secret witness, or any other source of specific inside information about the plotting (Memo, p.9), because of course we cannot know, and may never know, the details of the plotting and how it came about.  But the above train of events certainly supports an inference that defendants were involved, with others, in causing the otherwise inexplicable failure of the nation's defenses which allowed the attack to take place; that there was agreement among them, and others, at a minimum, that there would be a stand-down order, and that no warnings would be given at the Pentagon; and that the failures of defenses under their command would be ignored, and whitewashed in whatever way(s) possible, and the truth concealed by all the means at their command.  Surely this is enough to satisfy Rule 8, under *Iqbal*, and with it the stricture that plaintiffs must plainly state 'who did what to whom', in violation of constitutional rights.  We have done it.

## II.  THE PLAINTIFF'S CLAIMS ARE VALID AND COGNIZABLE

In the face of such a narrative defendants' assertion that plaintiff fails to state a claim is empty of meaning; instead presenting a shell which the Court is invited *sub silentio* to fill with an arbitrary pre-judgment.  That is not to say the plaintiffs' claim is routine or familiar in any way, or less than mortally shocking and off-putting, as discussed above; and it is clearly not rooted in any direct precedent.  Nevertheless, the intimation that the Constitution would provide no protection against the perversion of official power plaintiffs allege, and its injurious and deathly results, itself seems frivolous.

Plaintiffs have alleged and here re-allege they were victims of an unprivileged, substantive deprivation of their liberty, by a wrongful application (unleashing) of force, in circumstances of non-seizure, in violation of the substantive right to Due Process of Law under the Fifth Amendment, by acts and omissions of defendants (here taken as true) so reckless and extreme that their conduct genuinely and radically "shocks the conscience", as the high court's usage has it.[2]  They assert their injuries were brought about by defendants' acts under color of law, co-opting and abusing official power, heedlessly and wantonly creating great danger to plaintiffs and others, by conspiracy, and by defendants' knowing and deliberate indifference to and reckless, callous disregard for the loss of rights—and innocent life and limb—that would inevitably result.[3]

---

[2]    See *Sacramento County v. Lewis,* 523 U.S. 833 (1998), discussed further below.  The Court in *Lewis* reiterates that the rule of *Graham v Connor*, 490 U.S. 386 (1989), limits application of the Fourth Amendment to circumstances involving arrest, and therefore seizure; so, to the extent required by fair application of this principle, plaintiffs would abjure the Fourth Amendment claim asserted in their Complaint.  Other cases hold that alleged wrongful use of in circumstances not involving "seizure" (i.e, arrest) are analyzed under substantive due process standards.  See, e.g, *Wilson v. Northcutt*, 987 F.2d 719 (11th Cir. 1993)

[3]    In addition, plaintiffs would broaden the Constitutional theory of their claim to include rights of privacy and 'personal integrity', included in those reserved by the Ninth

**A.    There was a clear-cut constitutional right which was violated.**

"[T]he Due Process Clause was intended to prevent government officials from abusing [their] power, or employing it as an instrument of oppression." *County of Sacramento v Lewis,* 523 U.S. 833, 840 (1988):

> As to the words from Magna Charta, incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice. *Bank of Columbia v. Okely,* 17 U.S. 235, 4 Wheat. 235-244, 4 L.Ed. 559 (1819), as cited in *Hurtado v. California*, 110 U.S. 516, 527, 4 S.Ct., at 117 (1884).

Id. 523 U.S. at 845.  See also oft-cited, *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government, *Dent v. West Virginia*, 129 U.S. 114, 123, (1889)"); and myriad cases.  True, the Court in *Lewis* also said, not for the first time, "Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,' *Collins v. Harker Heights*, 503 U.S. 115, at 129, 112 S.Ct., at 1071 (1992)."[4]

Here, the plaintiff considers that, particularly in light of the unique and extreme

---

Amendment; and April Gallop further invokes her First Amendment rights, in particular, with regard to her claim of injuries and deprivations compounded on those she and her child sustained in the event, resulting from retaliation against her by or at the instigation of defendants, after she questioned  official actions and pronouncements which followed the attacks.  See Complaint, p.24, #58---which are certainly adequately pled, per Rule 8, contrary to defendants' protest (Memo, p.7).  For purposes of this motion at this time, however, their main constitutional cause of action rests on the substantive due process rights to life, liberty and property under the Fifth Amendment, per *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and they allege the assault upon them—brought about (at least in part) by the actions and conspiracy of these defendants and others— violated their liberty interest under the rules discussed in this section.

[4]    *County of Sacramento v Lewis*, 533 U.S. at 840, "quoting *Collins v City of Harker Heights*, 503 U.S. 115, at 126,… (quoting *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S., at 196, 109 S.Ct., at 1003,… in turn quoting *Davidson v. Cannon*, 474 U.S., at 348, 106 S.Ct, at 670-671…)."

character of her factual allegations, her claim of violation of the constitutional right to substantive Due Process, by actions which so radically shock the conscience, is categorically clear and sufficient, without reference to any binding or even analogous precedent.  The Court said the same thing in *Lewis*:

> [I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. That judgment may be informed by a history of liberty protection, but it necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them. Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways. *In none of our prior cases have we considered the necessity for such examples, and no such question is raised in this case.*

*County of Sacramento v Lewis*, 523 U.S. at  847 (Emphasis added).

In *Lewis*, the Court reviewed a case arising from a high speed police chase, begun on a moment's notice, resulting in the death in a crash of the passenger on a motorcycle whose driver was fleeing the police.  Considering precedents found in *Rochin v California*, 342 U.S. 165 (1952); *Breithaupt v. Abram*, 352 U.S. 432, 435, 77 S.Ct. 408, 410, 1 L.Ed.2d 448 (1957) (Conduct that "'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency" violates substantive due process), and like cases, the Court found that, while a spectrum of possible injuries might implicate other, more specific constitutional rights, the most 'egregious' and 'outrageous' could be held to violate substantive Due Process. It held that the high-pressure circumstances and conflicting interests involved in the chase scenario before it precluded a due process violation.  Referring again to the reasoning in *Collins v Harker Heights*, it said:

12

> [T]he substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." While the measure of what is conscience-shocking is no calibrated yard stick, it does, as Judge Friendly put it, "poin[t] the way." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, (1973).

503 U.S. at 129.

The un-constitutional—indeed anti-constitutional—supremely shocking character of the conduct alleged here, taken as true, requires no further explication. See generally, *Ingraham v Wright*, 430 U.S. 651, 673 (1977) (Due Process protects against "unjustified intrusions on personal security".); *Dwares v. City of New York*, 985 F.2d 94 (2nd Cir. 1993; *Rivas v. City of Passaic*, 365 F.3d 181 (3rd Cir. 2004).

## B.    There was a Conspiracy.

Defendants also attack the sufficiency of plaintiff's assertion of conspiracy among the named and other co-operating defendants whose identities are not yet fixable; but here again, as discussed above, the requirements of the law are amply met in the Complaint.  "It is elementary ...that conspiracies are seldom capable of proof by direct testimony and <u>may be inferred from the things actually done</u>." *Eastern States Retail Lumber Dealers Assn. v. United States*, 234 U.S. 600, 612 (1913) (emphasis added).  As spelled out by the Seventh Circuit years ago, in what has been righteously called "a primer" on conspiracy law,

> A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.' "  In order to prove the existence of a civil conspiracy, a plaintiff is not required to provide direct evidence of the agreement between the conspirators; "[c]ircumstantial evidence may provide adequate proof of conspiracy."  Absent the testimony of a coconspirator, it is unlikely that direct evidence of a conspiratorial agreement will exist. *Thus, the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a*

> possibility that the jury can "infer from the circumstances [that the
> alleged conspirators] had a 'meeting of the minds' and thus
> reached an understanding" to achieve the conspiracy's objectives.
>     A plaintiff seeking redress need not prove that each participant
> in a conspiracy knew the "exact limits of the illegal plan or the
> identity of all participants therein."  An express agreement among
> all the conspirators is not a necessary element of a civil conspiracy.
> The participants in the conspiracy must share the general
> conspiratorial objective, but they need not know all the details of
> the plan designed to achieve the objective or possess the same
> motives for desiring the intended conspiratorial result. To
> demonstrate the existence of a conspiratorial agreement, it simply
> must be shown that there was "a single plan, the essential nature
> and general scope of which [was] known to each person who is to
> be held responsible for its consequences."

*Hampton v. Hanrahan*, 600 F.2d 600, 620-21 (7th Cir. 1979), reversed in part on other

grounds, *per curiam*, 446 U.S. 754, 100 S.Ct 1987 (1980) (Emphasis added, citations

omitted).  Further,

> To be liable as a conspirator, you must be a voluntary participant
> in a common venture, although you need not have agreed to the
> details of the conspiratorial scheme or even know who the other
> conspirators are.  It is enough if you understand the general
> objectives of the scheme, accept them, and agree, either explicitly
> or implicitly, to do your part to further them.  Beyond this,
> attempts at definition will not help.

*Jones v. City of Chicago*, 856 F2d 985, 992 (7th Cir. 1988) (citations omitted).  See also,

*Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *Frazier v. SEPTA*, 785 F.2d

65, 67 (3rd Cir. 1986); *Roberts v. Heim*, 670 F. Supp. 1466, 1484 (N.D.Cal. 1987), citing

*Gilbert v. Bagley*, 492 F. Supp. 714, 727 (M.D.N.C. 1980).  In *Hafner v. Brown*, 923 F.2d

570 (4th Cir. 1992), police officers were held liable who merely stood by and watched

while other officers beat the plaintiff; the trial court's ruling that this was sufficient

evidence of a conspiracy was upheld.  In *Adickes v Kress*, 398 U.S. 144 (1970), an

allegation of momentary eye contact between defendants was sufficient evidence of "a

meeting of the minds" on the intention to act jointly in violation of the plaintiffs' rights.

    Given the facts plaintiffs have presented about what happened, and in particular

what didn't happen, the acts and omissions of defendants are impossible to imagine without a meeting of the minds on their complicity.

## C.    Defendants are not entitled to Qualified Immunity

A 'qualified immunity' from suit is available to public officials for acts and omissions by which they are said to have violated constitutional rights, or a right, if that right was not "clearly established" in law. *Harlow v. Fitzgerald,* 457 U.S. 800 (1982). The precise conduct in question need not have been the subject of a prior decision or statutory enactment, it is said, but 'the contours of the right must be sufficiently clear so that a reasonable official in the defendant's shoes would know' that such action or inaction would be a violation. *Anderson v Creighton*, 483 U.S. 635, 640 (1987); *Hope v Pelzer*, 536 U.S. 730, 741 (2002). The principle is said to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Etc, etc.

Plaintiffs reiterate the Supreme Court's language quoted above: "[T]he Due Process Clause was intended to prevent government officials from abusing power, or employing it as an instrument of oppression." "[T]he substantive component of the Due Process Clause is violated by executive action... when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" "[T]he words from Magna Charta,... were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice." See *Sacramento v Lewis*, supra, 533 U.S. at 540**.**

At the risk of running on where defendants were so terse (Memo, p.8-9), plaintiffs would add only that the qualified immunity claim here is wholly unfounded, in the circumstances, and frivolous; and in fact transparently intended only to provide grounds for an immediate appeal, under the rule of *Mitchell v. Forsyth*, 472 U.S. 511 (1985), if the claim is denied. Plaintiffs believe such an appeal would also be frivolous, and dilatory

only (to the extent it did not constitute forum shopping); so we would be asking the Court to so state, plainly, so it can be quashed.  See, e.g, *Chuman v. Wright*, 960 F.2d 104, 105 (9th Cir. 1992); *Behrens v. Pelletier*, 516 U.S. 299, 310 (1996).

## III.    THERE IS NO ESTOPPEL, AND NO TIME-BAR

## A.    The Estoppel Claim is Unfounded

Defendants say plaintiff is estopped from the assertion in her Complaint that no plane hit the Pentagon, by virtue of language in an earlier case she was involved in, to the effect that 9/11 hijackers flew a plane into the Pentagon.  That phraseology, however, stating a foregone conclusion, in passing, as background for a wholly separate claim, in a different case with different parties, where the assertion had no bearing on the merits of the claim or the Court's disposition of it, cannot remotely meet the test for an estoppel which the law prescribes; and is no predicate for dismissal in any case.

The government cites two cases on judicial estoppel, *Bates v. LIRR Co*., 997 F.2d 1028 (2nd Cir.1993) and *Uzdavines v. Weeks Marine Inc*., 418 F.3d 138 (2nd Cir. 2005), in which the Court specified a two-prong test: "First, the party against whom the estoppel is asserted must have <u>argued</u> an inconsistent position in a prior proceeding; and second, the prior inconsistent position must have been adopted by the court in some manner." (*See Bates*, supra 997 F.2d at1038.[5]

In *Uzdavines*, when a longshoreman sued his employer for disability from asbestos-related ailments, the defendant stipulated, <u>only</u> for the purposes of the disability proceeding, that he was covered by the Longshore and Harbor Workers Compensation Act ("LHWCA").  The Administrative Law Judge dismissed the proceeding because the worker had entered into a settlement agreement with a third party without the prior

---

[5]    Defendants ignore the Court's further statement that "the doctrine has not been uniformly adopted by federal courts, and its elements have never been clearly defined in this Court" and in fact, the "Tenth Judicial Circuit has rejected the doctrine of judicial estoppel" altogether.  Id at 1037-38

approval of the employer, in violation of LHWCA.   Later the man died, and his wife

brought a survivor's claim against the employer, Weeks.  In that action, Weeks asserted

that Uzdavines was not a seaman and therefore not covered by the LHWCA.  The

administrative court agreed and the widow appealed.

On appeal, the Second Circuit ruled that Weeks was not judicially estopped from

asserting that Uzdavines was not covered under LHWCA in the survivors claim despite

stipulating to the contrary in the disability action.  The court said the stipulation by the

parties was for the sole purpose of the disability proceeding.  Moreover, the Judge in the

disability case never made a determination as to whether Uzdavines was a seaman – an

issue that became central to the subsequent survivor claim.  418 F.3d at 148.  The Court

referred to the ruling of the Supreme Court in *New Hampshire v. Maine*, 532 U.S. 742,

749 (2001):

> First, a party's later position must be clearly inconsistent with its
> earlier position.   Second, courts regularly inquire whether the
> party has succeeded in persuading a court to accept that party's
> earlier position, so that judicial acceptance of an inconsistent
> position in a later proceeding would create the perception that
> either the first or the second court was misled.... A third
> consideration is whether the party seeking to assert an inconsistent
> position would derive an unfair advantage or impose an unfair
> detriment on the opposing party if not estopped.

(Id. at p.147, emphasis added) and said, further, that it would "limit[ ] the doctrine of

judicial estoppel to situations where the risk of inconsistent results with its impact on

judicial integrity is certain." (citing, *Simon v. Safelite Glass Corp*., 128 F.3d 68, 72 (2d

Cir.1997).  Id. at p.148, emphasis added.

In *Bates v. LIRR,* as defendants note, the Court earlier prescribed the same two

basic elements: "First, the party against whom the estoppel is asserted must have argued

an inconsistent position in a prior proceeding; and second, the prior inconsistent position

must have been adopted by the court in some manner;" i.e, the same rule, less fully

articulated.  997 F.2d  at 1038.  "Thus," the Court said,

> [T]here are two distinct objectives behind judicial estoppel, both of
> which seek to protect the judicial system.  First, the doctrine seeks
> to preserve the sanctity of the oath by demanding absolute truth
> and consistency in all sworn positions.  Preserving the sanctity of
> the oath prevents the perpetuation of untruths which damage public
> confidence in the integrity of the judicial system.   Second, the
> doctrine seeks to protect judicial integrity by avoiding the risk of
> inconsistent results in two proceedings.

In the instant case, the purported inconsistency cited by defendants does not come close to threatening any of the harm the doctrine protects against; neither did the Court rely on it, nor was it misled, in the earlier case, to which defendants were not party. Defendants' estoppel claim is without merit.

## B.   The Statute of Limitations Claim is problematic, but Cannot Fairly be Resolved Against Ms. Gallop at this Stage; and Need Not Be, because the Case will Continue on the Same Terms, Regardless...

If plaintiffs are at all correct in their basic allegations of conspiracy in this case, there is murder and attempted murder at the heart of it and so, by rights, no Limitation should apply.  A Limitation of three years surely could apply to a regular civil rights claim; here, it could apply to the mother but not the child, under Virginia personal injury law, per *Wilson v. Garcia*, 471 U.S. 261 (1985), cited by defendants.  The question is, when and how was the statute triggered—if it was—to run against Ms. Gallop. Defendants give no suggestion on this issue; or rather, this question of fact.

Instead, defendants intimate that the statute ran from 9/11 itself, saying or suggesting the time ran from the event in which plaintiffs were physically injured; but this is not how the Statute works or could fairly work.  Plaintiff was injured in a terrorist attack, real, or secretly staged, or both.  She was officially told that hijackers had flown an airliner into the building while she and her son sat inside.  It was a long time from that moment to a time she was able to reasonably perceive and believe in an inside job.

The law says the Statute runs from the time you know or should know you have a

cause of action: that means you know your rights were violated, and more or less how and by whom; or you should know, because the knowledge is there before you.  *Scienter* is the point.  Here the plaintiff cannot be said to know it from the original event, as to which she was officially told that foreign terrorists were responsible.  Add the natural reluctance even to "go there", due to anyone's instinctive aversion to the possibility of a false flag conspiracy, as discussed above, which would materially influence the reasonable quantum and character of the information which could fairly be held to give rise to *scienter*, in the circumstances.  Again, a question of fact.

Defendants do not argue any other event or moment after 9/11 itself at which *scienter* should be held to attach; perhaps they will suggest one or more in support of their claim, but this too will only create an issue or issues of fact, about conspiracy, and cover-up, to be explored with all others and left to the Jury to decide.

Plaintiffs' base position here is that the Limitations period has been tolled, by 'fraudulent concealment' of the truth, see, e.g, *State of Tex. v. Allan Const. Co., Inc.* 851 F.2d 1526, 5th Cir. 1988; *Atlantic City Elec. Co. v. General Elec. Co,* 312 F.2d 236 (2nd Cir. 1962), and cases collected in *State of Colo. ex rel. Colorado Atty. Gen. v. Western Paving Const. Co.* 833 F.2d 867, 871 (10th Cir.1987), withdrawn on other grounds, 841 F.2d 1025 ("[E]very circuit court that has decided the issue allows tolling of the statute under the fraudulent concealment doctrine.").  Moreover, the period never ran, or was repeatedly extended by additional acts of concealment in furtherance of the conspiracy. *Hobson v. Wilson*, 737 F.2d 1 (D.C.Cir. 1984), *cert. denied* 470 U.S. 1084 (1985); *Fitzgerald v. Seamans*, 553 F.2d 220, 229 (D.C.Cir. 1977) (The plaintiff's knowledge of the grounds for suit must generally extend to an awareness of the persons responsible for plaintiff's injuries.).  So we say no three-year period occurred within which the Limitations period could have elapsed. Indeed, defendant Cheney extended it again, for a fact, in his deceitful AEI speech in May.

Looked at either way, there are factual questions that preclude a finding against

Ms. Gallop, and a decision by the Jury may be needed.  Moreover, the question is basically immaterial at this stage, because the case will continue on behalf of the child in any case, and she will be involved as chief witness and otherwise.  So there can be no fair dismissal on this grounds at this time.

## C.  Defendants' Other Claims

Defendants also attack claims plaintiffs included in the Complaint under the Ninth Amendment, as a *Bivens* item, and under the Anti-Terrorism Act, 18 USC 2333(a), as to which we suggest it would also be reasonable to defer ruling at this time.  Plaintiff has no more authority for a Ninth Amendment claim now than the right to privacy and 'bodily integrity', etc, articulated in *Griswold v. Connecticut*, 381 U.S. 479 (1965), *Roe v. Wade*, 410 U.S. 953 (1973), and their progeny, but we feel that further study and development of the evidence may well provide the basis for more clear and cogent cause of action.  As to the Anti-Terrorism count, the immunity in 18 USC 2337 may well be fatal, if it is upheld, <u>unless</u>, for example, it should emerge in discovery that one or more of the John Doe defendants are <u>not</u> government officials acting under color of law but private parties, conspiring with officials, who may be responsible under the act, and may drag officials in under it with them. See, e.g, *Dennis v. Sparks*, 449 U.S. 24 (1980).   Wherefore, we ask the Court to defer ruling on these claims now, until such time as it makes a material difference whether they are in or out of the case.

One last such issue remains, emanating from defendants' failure in this motion to raise any protest against plaintiffs' claims against the defendants individually under the Common Law.  If that means there will be a lawsuit under any circumstances, entailing a plenary inquiry into the facts plaintiffs have alleged, and the reach of the common law conspiracy, we suggest there is no good reason to dismiss any part of the Complaint at this time.  Discovery and independent confirmation of various fact claims—some of

which is shown in our Appendix—are likely to change the posture of the case as a whole, requiring re-assessment of the legal claims now under attack; so, for now, let them be…

### III.    THE COMPLAINT IS NOT FRIVOLOUS; ANYTHING BUT...

It being clear that plaintiffs had a constitutional right to be protected from a mortal attack by terrorists shockingly aided and abetted by the highest government officials, that those officials are not immune from suit for the conduct alleged, and that, one way or another, the case is not time barred, we reach the beating heart of the Government's plea on behalf of the defendants: that plaintiffs present "delusional conspiracy theories", which are  "factually baseless, irrational... wholly incredible", and which, as such, ought to be summarily thrown out of court, as frivolous.  Indeed, the Government urges the Court to recognize that Congress has "established", "as a factual matter", that Flight 77 hit the Pentagon, wherefore it need look no further for an excuse to suppress this mischief. ( Memo, p.14, n.9.)

There is no question the Court possesses the authority to do it, and, in contemplation of the agonies of going ahead, it may well experience the urge.  With all respect, however, it clearly can't fairly or legally or honestly give in at this stage.  As discussed above and shown in the Complaint, and in defendants' own description of it here, the theory is not delusional but very concrete, however horrifying its implications; and it is supported and fortified by myriad, well-pled factual details.  And these, we again assure the Court—and have sought to show in more detail in the attached Affidavit of David Ray Griffin, the Affirmation of William Veale, and our work-in-progress Appendix—are themselves supported, to a fare-thee-well, and will be proved out, by copious evidence from documents, records, photographs, witnesses, experts and science itself—and an enormous, though much ignored, national network of very reputable and well-established academic and other various interpreters, researchers and experts, who

collectively have made serious and exhaustive study and analysis of every aspect of what happened on that awful day, what led to it, and what has been revealed about it since.

The information is available, and a more detailed description of the substance and the sources—including particularly a (partial) roster and bibliography of the respectable authorities who have contributed and subscribed to various elements of the "delusion"— is presented and described in the Veale Affidavit and its exhibits. We believe the Court has authority to parse and test such material while permitting the case to go forward, and we invite all inquiry, and of course wish to discuss and be heard, about any reasonable phasing of proceedings which will serve to keep the forbidding and onerous premises of the plaintiff's 'theory' on a firm footing in the Court's mind, going forward. We are firm in the hope and trust that the Court will not be disposed to duck the issue, and, most respectfully, we hope it will see fit to vary its regular practice, and initiate such an evidence-validation inquiry at a live hearing on this motion, soon.

## CONCLUSION

We leave it at that, and commend the Court's attention to the matters rehearsed in our Appendix—the Griffin Affidavit is must reading, at a minimum—and we ask the Court to let us formally include it as part of this Memo, and to consider its contents as an integral part of the plaintiff's opposition to this motion, against the charge that we are irrational and delusional.

But one last thing, anent the general notion that such consummately evil plotting and action on the part of such prominent and high-ranking officials is simply beyond the pale, and inconceivable. Plaintiffs would point out that, a short time later, these same men and their cohorts assembled arguably the most powerful, lethal and destructive military strike force in history, pound for pound (say, aside from D-Day, and Fat Man and Little Boy), and sent it across the world to violently invade and conquer and hugely destroy with *blitzkrieg* a sovereign country, Iraq, which had given the U.S. no cause of war whatsoever—whose dictatorship government, indeed, had famously collaborated

with the U.S., in previous years when these same men were in power, in making deadly, unprovoked war against Iran, and using poison gas against its own people—based entirely on deceit, and many crucial outright lies.[6]

Tens and even hundreds of thousands, perhaps a million or more innocent Iraqis have been killed, upwards of five million more made refugees, and the bodies and lives of countless others ruined; uncounted thousands have been imprisoned, tortured and abused; schismatic religious rivals who lived peacefully together in mixed communities for centuries, were turned murderously against each other, in a civil war which still roils the population after six years; schools, hospitals and water and power and sewage infrastructures were destroyed and have not been re-built; entire communities, even unto the whole of Fallujah, a city the size of Toledo, or Tampa, were leveled to the ground, and their inhabitants killed, or put in prison camps or, simply driven out into the desert; and a puppet government was established to put a good face on it all.

This was among the worst examples imaginable of what the Law of Nations—and particularly the laws of war established by the United States itself at Nuremburg, after World War II—holds as "the greatest international crime", which has gone un-charged, unacknowledged, let alone unpunished, and which defendants Cheney and Rumsfeld are responsible for, above all others. By comparison, the evil character of their foundational activities in connection with 9/11, as here alleged, looks like small potatoes.

In any event, the shocking character of the allegations cannot provide a basis for dismissal of cogent charges based on well-pleaded facts; that is elementary.  If the Court finds problems with the pleading, they can surely be addressed short of dismissal, because the facts are there, and Rule 11 is satisfied.  Defendants present no lawful basis on which they can be absolved from accountability for the supremely grave implications of plaintiffs' stated facts—as do many additional facts, as so elegantly, chillingly and

---

[6]   See, e.g, from today's news online **David Swanson | What Bush Told Blair Could End the Wars,** http://www.truthout.org/062209T?n

inexorably narrated in the within Affidavit from David Ray Griffin, the undoubted perfect master 9/11 Truth investigation, whose categorical knowledge and mastery of the mass of information and contradictions which has emerged—and can be shown anywhere, including to a Jury, on very short notice.  Viewed objectively, they will persuade any reasonable person of the *absolute legitimacy of the questions that are raised by the facts alleged in this case,* period.

The charge is clear, and 'shocking to the conscience', beyond measure.  The facts are there, and cannot be avoided or ignored.  The motion must be denied.

## PRAYER FOR RELIEF

WHEREFORE,  the plaintiffs ask this honorable Court

+ To grant plaintiffs leave to file our attached Appendix, consisting of the above-mentioned brilliant and compelling Affidavit of David Ray Griffin, describing the ambit and depth of true substance in the factual and scientific basis of the plaintiffs' claims which exists, and can be shown, along with a variety of additional statements and other materials identified and described in the Affirmation of Plaintiffs' Counsel, William W. Veale; and to take into account the matters there adduced to show the non-frivolous character of this case;

+ To convene a live hearing of oral argument on the merits of the instant motion, and plaintiffs' response—notwithstanding your normal practice, in light of the gravity and complexity of the issues presented—where matters arising under Rules16 and 26 F.R.Civ P. can also be addressed, *pro tanto*;

+ To agree to reserve any decision on the defendants' Statute of Limitations claim against Ms. Gallop, and the plaintiffs' claims under the Ninth Amendment, the Anti-Terrorism Act, and the Common Law, for the reasons given; and, otherwise,

///

+  To deny defendants' Motion to Dismiss in all respects; and,

+  To grant such other and further relief as may be deemed just and appropriate in
the premises of the case.

Yours, etc.,

DATED: June 29, 2009.

Dennis Cunningham  (DC 7142)
36 Plaza Street
Brooklyn, NY 10211
718-783-3682
denniscunninghamlaw@gmail.com

William W. Veale
2033 North Main Street, #1060
Walnut Creek, CA 94596
925-935-3987
centerfor911justice@gmail.com

Mustapha Ndanusa
26 Court Street, #603
Brooklyn, NY 11201
718-825-7719
mndanusa@gmail.com